**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 19-2222

CASA DE MARYLAND, INC.; ANGEL AGUILUZ; MONICA CAMACHO PEREZ,

Plaintiffs – Appellees,

v.

DONALD J. TRUMP, in his official capacity as President of the United States; CHAD WOLF, in his official capacity as Acting Secretary of Homeland Security; U.S. DEPARTMENT OF HOMELAND SECURITY; KENNETH T. CUCCINELLI, II, in his official capacity as Acting Director, U.S. Citizenship and Immigration Services; U.S. CITIZENSHIP AND IMMIGRATION SERVICES,

Defendants – Appellants.

------------------------------

IMMIGRATION REFORM LAW INSTITUTE,

Amicus Supporting Appellants.

104 BUSINESSES AND ORGANIZATIONS; AMERICAN ACADEMY OF PEDIATRICS; MARYLAND CHAPTER, AMERICAN ACADEMY OF PEDIATRICS; VIRGINIA CHAPTER, AMERICAN ACADEMY OF PEDIATRICS; AMERICAN MEDICAL ASSOCIATION; MARYLAND STATE MEDICAL SOCIETY; AMERICAN COLLEGE OF PHYSICIANS; AMERICAN COLLEGE OF OBSTETRICIANS AND GYNECOLOGISTS; INSTITUTE FOR POLICY INTEGRITY AT NEW YORK UNIVERSITY SCHOOL OF LAW; UNITED STATES HOUSE OF REPRESENTATIVES; LEGAL HISTORIANS; CENTER FOR REPRODUCTIVE RIGHTS; MEMBERS OF CONGRESS; JUDY CHU, Chair of the CAPAC; ADRIANO ESPAILLAT, CHC Whip; YVETTE D. CLARKE, Chair of the CBC Immigration Task Force; JOAQUIN CASTRO, Chair of the CHC; KAREN BASS, Chair of the CBC; PRAMILA JAYAPAL, Chair of the CAPAC Immigration Task Force; BARBARA LEE, Co-Chair of the CAPAC

Healthcare Task Force; NONPROFIT ANTI-DOMESTIC VIOLENCE AND SEXUAL ASSAULT ORGANIZATIONS; IMMIGRATION LAW PROFESSORS; FISCAL POLICY INSTITUTE; PRESIDENTS' ALLIANCE ON HIGHER EDUCATION AND IMMIGRATION; PUBLIC JUSTICE CENTER,

        Amici Supporting Appellees.

---

Appeal from the United States District Court for the District of Maryland, at Greenbelt. Paul W. Grimm, District Judge.  (8:19-cv-02715-PWG)

---

Argued:  May 8, 2020                              Decided:  August 5, 2020

---

Before WILKINSON, NIEMEYER, and KING, Circuit Judges.

---

Reversed and remanded by published opinion. Judge Wilkinson wrote the opinion, in which Judge Niemeyer joined.  Judge King wrote a dissenting opinion.

---

**ARGUED**:  Gerard Joseph Sinzdak, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellants.  Jonathan Backer, GEORGETOWN UNIVERSITY LAW CENTER, Washington, D.C., for Appellees.  Adam A. Grogg, UNITED STATES HOUSE OF REPRESENTATIVES, Washington, D.C., for Amicus Curiae.  ON BRIEF: Joseph H. Hunt, Assistant Attorney General, Daniel Tenny, Joshua Dos Santos, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Robert K. Hur, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellants.  Amy L. Marshak, Joshua A. Geltzer, Mary B. McCord, Institute for Constitutional Advocacy and Protection, GEORGETOWN UNIVERSITY LAW CENTER, Washington, D.C., for Appellees.  Michael M. Hethmon, Lew Olowski, IMMIGRATION REFORM LAW INSTITUTE, Washington, D.C., for Amicus Immigration Reform Law Institute.  Paul W. Hughes, Michael B. Kimberly, Matthew A. Waring, MCDERMOTT WILL & EMERY LLP, Washington, D.C., for Amici 104 Businesses and Organizations.  Susan M. Krumplitsch, Elizabeth Stameskin, Priyamvada Arora, COOLEY LLP, Palo Alto, California, for Amici American Academy of Pediatrics; Maryland Chapter, American Academy of Pediatrics; Virginia Chapter, American Academy of Pediatrics; American Medical Association; Maryland State Medical Society; American College of Physicians; American College of Obstetricians and Gynecologists.  Richard L. Revesz, Jack Lienke, Max Sarinsky, INSTITUTE FOR POLICY INTEGRITY AT NEW YORK UNIVERSITY SCHOOL OF LAW, New York,

New York, for Amicus Institute for Policy Integrity at New York University School of Law. Robert M. Loeb, Thomas M. Bondy, Peter E. Davis, Emily Green, Washington, D.C., Rene Kathawala, Jessica Edmundson, Allison Epperson, New York, New York, M. Todd Scott, ORRICK, HERRINGTON & SUTCLIFFE LLP, San Francisco, California; Douglas N. Letter, General Counsel, Todd B. Tatelman, Principal Deputy General Counsel, Megan Barbero, Josephine Morse, Adam A. Grogg, William E. Havemann, Office of General Counsel, UNITED STATES HOUSE OF REPRESENTATIVES, Washington, D.C., for United States House of Representatives. Alexandra Wald, COHEN & GRESSER LLP, New York, New York; Elizabeth B. Wydra, Brianne J. Gorod, Dayna J. Zolle, CONSTITUTIONAL ACCOUNTABILITY CENTER, Washington, D.C., for Amici Legal Historians. Jenny Ma, Pilar Herrero, Amy Myrick, Elyssa Spitzer, CENTER FOR REPRODUCTIVE RIGHTS, New York, New York, for Amicus Center for Reproductive Rights. Gare Smith, Kristyn DeFilipp, Andrew London, Emily J. Nash, FOLEY HOAG, LLP, Boston, Massachusetts; Justin Lowe, Wendy Parmet, HEALTH LAW ADVOCATES, INC., Boston, Massachusetts, for Amici Health Law Advocates, Inc. and Other Organizations Interested in Public Health. Nilda Isidro, Amanda Burns, Christine Armellino, New York, New York, Caroline H. Bullerjahn, GOODWIN PROCTOR LLP, Boston, Massachusetts, for Amici Members of Congress Judy Chu, Chair of the CAPAC; Adriano Espaillat, CHC Whip; Yvette D. Clarke, Chair of the CBC Immigration Task Force; Joaquin Castro, Chair of the CHC; Karen Bass, Chair of the CBC; Pramila Jayapal, Chair of the CAPAC Immigration Task Force; Barbara Lee, Co-Chair of the CAPAC Healthcare Task Force, et al. Paul J. Lawrence, Alanna E. Peterson, PACIFICA LAW GROUP LLP, Seattle, Washington, for Amici Nonprofit Anti-Domestic Violence and Sexual Assault Organizations. Harry Lee, Mary Woodson Poag, Johanna Dennehy, STEPTOE & JOHNSON LLP, Washington, D.C., for Amici Immigration Law Professors. Monisha Cherayil, Sally Dworak-Fisher, Tyra Robinson, PUBLIC JUSTICE CENTER, Baltimore, Maryland, for Amicus Public Justice Center. Sadik Huseny, Brittany N. Lovejoy, Joseph C. Hansen, Tess L. Curet, Alexandra B. Plutshack, LATHAM & WATKINS LLP, San Francisco, California, for Amici Fiscal Policy Institute & Presidents' Alliance on Higher Education and Immigration, et al.

WILKINSON, Circuit Judge:

The Immigration and Nationality Act ("INA") says that any alien who is "likely at any time to become a public charge is inadmissible." 8 U.S.C. § 1182(a)(4)(A).[1] Congress has included some version of a "public charge" provision in the nation's immigration laws since 1882, but it has never defined the term, instead leaving its implementation to the executive branch. Recently, the Department of Homeland Security ("DHS") sought via rulemaking to define "public charge" as an alien who was likely to receive certain public benefits, including many cash and noncash benefits, for more than 12 months in the aggregate over any 36-month period ("DHS Rule" or "Rule"). The district court here enjoined the Rule nationwide.

In this case, statutory interpretation meets the separation of powers. To invalidate the Rule would visit palpable harm upon the Constitution's structure and the circumscribed function of the federal courts that document prescribes. Striking the Rule would also entail the disregard of the plain text of a duly enacted statute, all in an area where the Constitution commands "special judicial deference" to the political branches in light of the intricacies and sensitivities inherent in immigration policy. *Fiallo v. Bell*, 430 U.S. 787, 793 (1977). Finally, we are asked here to endorse a particular remedy—a nationwide injunction of the Rule—that reaches expansively beyond any proper conception of the judicial role.

---

[1] Consistent with the INA, the DHS Rule, and our dissenting colleague, we employ the term "alien" throughout this opinion. *See* 8 U.S.C. § 1101(a)(3) (defining the term "alien" as "any person not a citizen or national of the United States"); Inadmissibility on Public Charge Grounds, 84 Fed. Reg. 41,292 (Aug. 14, 2019).

The above does not mean that the plaintiffs' view of the public charge provision is definitively wrong. Nor does it mean that the government's view of the public charge provision is definitively right. Rather, the public charge provision has led for almost a century and a half a long and varied life, with different administrations advancing varied interpretations of the provision, depending on the needs and wishes of the nation at a particular point in time. To be sure, the public charge provision ties alien admissibility to prospective alien self-sufficiency. But within that broad framework, Congress has charged the executive with defining and implementing what can best be described as a purposefully elusive and ambiguous term. Congress has assiduously resisted giving the term the kind of fixed and definite meaning that the plaintiffs to this lawsuit seek, and we are reluctant to step in and perform that task ourselves, thus transferring primacy in national immigration policy from the democratically accountable branches where it has long been thought to reside.

There is a further and daunting obstacle to invalidating the Rule. In the course of prolonged litigation in the lower federal courts, the Second and Seventh Circuits declined to stay injunctions issued by trial courts precluding enforcement of the Rule. *See New York v. Dep't of Homeland Sec.*, No. 19-3591, 2020 WL 95815 (2d Cir. Jan. 8, 2020); Order, *Cook Cty., Illinois v. Wolf*, No. 19-3169 (7th Cir. Dec. 23, 2019). The Supreme Court thereupon granted the government's emergency request to stay the preliminary injunctions, an action which would have been improbable if not impossible had the government, as the stay applicant, not made "a strong showing that it was likely to succeed on the merits." *See Wolf v. Cook Cty., Illinois*, 140 S. Ct. 681 (2020); *Dep't of Homeland Sec. v. New York*,

5

140 S. Ct. 599 (2020); *see also Nken v. Holder*, 556 U.S. 418, 434 (2009). We may of course have the technical authority to hold that, notwithstanding the Supreme Court's view, the plaintiffs are likely after all to succeed on the merits of their challenge. But every maxim of prudence suggests that we should decline to take the aggressive step of ruling that the plaintiffs here are in fact likely to succeed on the merits right upon the heels of the Supreme Court's stay order necessarily concluding that they were unlikely to do so. Such a step would require powerful evidence that the Supreme Court's stay was erroneously issued. Such evidence is absent here.

It is surprising that the dissenting opinion makes light of the Supreme Court's action in these parallel cases. *See* Dissenting Op., *post* at 107 n.16. The Supreme Court does not ordinarily issue such stays. *See Fargo Women's Health Org. v. Schafer*, 507 U.S. 1013, 1014 (1993) (O'Connor, J., concurring) (finding the case not "one of those rare and exceptional cases in which a stay pending appeal is warranted"). Moreover, those two cases were more than ordinary cases. They involved the exact same issue before us today. It is curious, to say the least, that we might even suggest that the Supreme Court gave scant attention to the stay request and thus treat the stay order as merely "perfunctory." Dissenting Op., *post* at 108 n.16.

The stays here were granted by the whole court, not a single Justice. *See Cook Cty.*, 140 S. Ct. at 681 (referring stay application presented to Justice Kavanaugh to whole court); *New York*, 140 S. Ct. at 599 (referring stay application presented to Justice Ginsburg to whole court). In such cases, "the affirmative votes of a majority of the participating Justices are required to grant it." Stephen M. Shapiro et al., *Supreme Court Practice* 892

(10th ed. 2013) (collecting cases). Thus, this case is not a situation in which "matters cannot be predicted with certainty," such that one Justice must weigh whether "it is more likely than not that at least five Justices will agree with the" judgment below. *Araneta v. United States*, 478 U.S. 1301, 1304 (1986) (Burger, C.J., in chambers). Rather, five Justices necessarily "conclude[d] there [wa]s a 'fair prospect' that a majority of this Court w[ould] decide the issue in favor of the applicants" in order to grant the stay. *Id.* This stay gives us a window into the Supreme Court's view of the merits. Our court should not cultivate the appearance of denying the Supreme Court action its obvious and relevant import.

We are of course duty-bound to give this appeal a thorough and conscientious review. For the reasons that follow, we think the Rule is a permissible interpretation of the public charge provision, and that to hold otherwise would be a stark transgression of the judiciary's proper role. Accordingly, we reverse the judgment and remand for further proceedings consistent with this opinion.

I.

A.

We begin with a brief overview of the public charge provision's long history. Though, as discussed below, the provision has been amended numerous times over the past 138 years, its motivating purpose has remained the same—to prevent the admission of aliens who, to one degree or another, would depend on the public for their support and care.

Congress first enacted a public charge provision in 1882. *See* Act of Aug. 3, 1882, ch. 376, § 2, 22 Stat. 214. The 1882 Immigration Act specified in relevant part that no

7

"person unable to take care of himself or herself without becoming a public charge" would "be permitted to land" in the United States. *Id.* The 1882 Act did not define the term "public charge," nor did it specify the amount or type of public support that would render an alien inadmissible on that basis.

Instead, the interpretation and application of the public charge provision was entrusted to the executive branch. The 1882 Act charged the Secretary of the Treasury "with the duty of executing the provisions of this act and with supervision over the business of immigration to the United States," 22 Stat. 214, and vested him with the power to "establish such regulations and rules . . . for carrying out the provisions of this act and the immigration laws of the United States," *id.*

In 1891, Congress revised the federal immigration laws, including the public charge provision. *See* Act of Mar. 3, 1891, ch. 551, 26 Stat. 1084. Specifically, the 1891 amendment divided the 1882 Act's general bar on admitting public charges into two complementary provisions, the "inadmissibility provision" and the "deportation provision." The inadmissibility provision called for a prospective assessment of whether an alien seeking to enter the United States was "likely to become a public charge" and prohibited the admission of all such aliens. *Id.* § 1. The deportation provision, on the other hand, required a retrospective assessment of whether an alien who had already been admitted to the United States had "become[] a public charge within one year after his arrival in the United States from causes existing prior to his landing therein." *Id.* § 11. If so, the Act provided that such an alien could be deported. These two provisions were designed to work hand-in-hand: the latter served as a backstop when immigration officials

8

applying the former failed to accurately predict that a given alien was likely to become a "public charge." And this bifurcation in the law persists today. 8 U.S.C. §§ 1182(a)(4), 1227(a)(5). The 1891 amendment, like the 1882 Act, did not define the term "public charge." But the 1891 amendment, like the 1882 Act, confirmed that the executive would be responsible for enforcing this component of national immigration policy. *See* § 8, 26 Stat. 1084, 1085.

Between 1891 and 1917, Congress amended the federal immigration statute three times. *See* Act of Mar. 3, 1903, ch. 1012, 32 Stat. 1213; Act of Feb. 20, 1907, ch. 1134, 34 Stat. 898; Act of Mar. 26, 1910, ch. 128, 36 Stat. 263. Three points bear noting. First, none of these amendments provided a definition of "public charge." Second, Congress retained both the inadmissibility and deportation provisions in each amendment. Third, Congress continued to afford the executive wide latitude in enforcing the relevant grounds for inadmissibility, including interpretation of the public charge provision. *See, e.g.*, §16, 34 Stat. 898, 903.

In 1915, a Supreme Court decision prompted yet another set of amendments. That year, the Court issued its first decision directly interpreting the public charge provision. *See Gegiow v. Uhl*, 239 U.S. 3 (1915). The "single question" presented in *Gegiow* was "whether an alien can be declared likely to become a public charge on the ground that the labor market in the city of his immediate destination is overstocked." *Id.* at 9–10. The Supreme Court said no. It noted that "[t]he statute deals with admission to the United States, not to" a particular locality. *Id.* at 10. And it reasoned that the term "public charge" should "be read as generically similar to the others mentioned before and after" it in the

9

1910 Act, which then included "paupers and professional beggars." *Id.* As such, the Court concluded that public charge determinations should be made "on the ground of permanent personal objections" to the alien, rather than "local [labor] conditions." *Id.* at 10.

In 1917, Congress responded to the *Gegiow* decision. Specifically, it moved the public charge provision to the end of a list of factors rendering an alien inadmissible. The revised statute made inadmissible, among others,

> persons . . . who are . . . mentally or physically defective, such physical defect being of a nature which may affect the ability of such alien to earn a living; persons who have been convicted of or admit having committed a felony or other crime or misdemeanor involving moral turpitude; polygamists, or . . . persons likely to become a public charge.
> Act of Feb. 5, 1917, ch. 29, § 3, 39 Stat. 874, 875–76.

The legislature amended the statute in this manner "in order to indicate the intention of Congress that aliens shall be excluded upon [the public charge] ground for economic as well as other reasons" and did so, specifically, "to overcome[e] the decision of the Supreme Court in [*Gegiow*]." *See* 70 Cong. Rec. 3620 (1929). While Congress moved the placement of the public charge provision to respond to *Gegiow*, it still did not define the term, leaving the application of the provision in the hands of immigration officials and the executive branch.

For its part, the executive branch regarded the public charge provision as a flexible one, varying its interpretation and enforcement strategy in light of its policy objectives and prevailing national conditions. For example, in the early 20th century, immigration officers often utilized the provision as a "catchall," excluding aliens on public charge grounds when no other basis for inadmissibility seemed applicable. *See* Jane Perry Clark, *Deportation of*

10

*Aliens from the United States to Europe* 104 (1931). Later, in response to high levels of unemployment brought on by the Great Depression, President Hoover ordered that the provision be enforced more stringently, such that all aliens who would "probably be a public charge at any time, even during a considerable period subsequent to [their] arrival" would be inadmissible. *See* Roger Daniels, *Guarding the Golden Door: American Immigration Policy and Immigrants Since 1882*, at 60–62 (2004). The executive eventually began to develop more formal standards to govern public charge determinations. For example, the Board of Immigration Appeals promulgated a three-part test for an alien to be found deportable as a "public charge" in 1948. *Matter of B-*, 3 I. & N. Dec. 323 (BIA 1948). Specifically, the BIA concluded that in order for someone to be designated a deportable public charge, "(1) the State or other governing body must, by appropriate law, impose a charge for the services rendered to the alien . . . (2) make demand for payment of the charges[,] . . . [and] (3) there must be a failure to pay for the charges." *Id.* at 326.

In 1952, Congress comprehensively reformed federal immigration law. Since then, "[t]he foundation of our laws on immigration and naturalization [has been] the Immigration and Nationality Act." *Kansas v. Garcia*, 140 S. Ct. 791, 797 (2020). As relevant here, the INA included a revised public charge inadmissibility provision, which codified for the first time what was already well-established in practice: that the executive branch is accorded significant discretion in dealing with the provision. *See* Immigration and Nationality Act, Pub. L. No. 82-414, tit. II, ch. 2, § 212, 66 Stat. 163, 183 (1952). Importantly, the INA rendered inadmissible all aliens who "*in the opinion of the Attorney General . . . are likely at any time to become public charges.*" *Id.* (emphasis added). The INA included a revised

11

deportation provision with similar language. *See id.* ch. 5, § 241(a)(8) (pegging such decisions to the "opinion of the Attorney General"). Congress once again declined to define the term "public charge," "but rather . . . establish[ed] the specific qualification that the determination of whether an alien falls into that category rests within the discretion of the" relevant executive branch immigration officials. S. Rep. No. 81-1515, 347, 349 (1950). It is this iteration of the inadmissibility provision, as amended, that the DHS Rule at issue here purports to interpret.

Congress subsequently amended the public charge inadmissibility provision twice more. First, in 1990, it eliminated various antiquated bases for inadmissibility, such as whether the alien was a "pauper[], professional beggar[], or vagrant[]." *See* 136 Cong. Rec. 36844 (1990). In their place, Congress retained the single generic phrase "likely to become a public charge." Immigration Act of 1990, Pub. L. No. 101-649, tit. VI, § 601, 104 Stat. 4978, 5072. Then, Congress passed the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"). Omnibus Consolidated Appropriations Act, tit. V, § 531, 110 Stat. 3009 (1996). That statute recodified the inadmissibility provision in its current form, specifying that "[a]ny alien who, in the opinion of the . . . Attorney General at the time of application for admission or adjustment of status, is likely at any time to become a public charge is inadmissible." *Id.*; *see also id.* tit. III, § 308; 8 U.S.C. § 1182(a)(4)(A).[2] Moreover, although the IIRIRA did not define "public charge,"

---

[2] Specific classes of aliens, including asylum seekers and refugees, are not subject to the public charge provision. *See* 8 U.S.C. §§ 1157, 1158, 1159.

it specified five non-exclusive factors that executive branch officials were required to take into account when making public charge admissibility determinations: the alien's "age;" "health;" "family status;" "assets, resources, and financial status;" and "education and skills." *See* 8 U.S.C. § 1182(a)(4)(B).

While Congress continued to tweak the statutory language, the executive branch continually refined its working definition of "public charge." In 1974, the BIA announced that the three-part test for deportation determinations set forth in *Matter of B-* would not apply to public charge inadmissibility decisions. *See Matter of Harutunian*, 14 I. & N. Dec. 583, 585 (1974). Instead, whether an alien was likely to become a "public charge" for admissibility purposes would be based on the totality of the alien's circumstances, with an eye toward whether the alien would "need public support" to some unenumerated degree. *Id.* at 589–90. Then, in 1999, the Department of Justice initiated a rulemaking in which it sought to define the term "public charge" for purposes of both the inadmissibility and deportation provisions. *See* Inadmissibility and Deportability on Public Charge Grounds, 64 Fed. Reg. 28,676 (May 26, 1999) (to be codified at 8 C.F.R. pts. 212 & 237). Specifically, the 1999 Rule would have defined "public charge" as "an alien who has become (for deportation purposes) or who is likely to become (for admission/adjustment purposes) primarily dependent on the Government for subsistence as demonstrated by either: (i) The receipt of public cash assistance for income maintenance purposes, or (ii) Institutionalization for long-term care at Government expense (other than imprisonment for conviction of a crime)." *Id.* at 28,681. Though it proposed to adopt a unified definition of "public charge," the 1999 Rule retained the "totality of the circumstances" and the three

13

step *Matter of B-* tests for assessing inadmissibility and deportability, respectively. *See id.* at 28,679–80.

The 1999 Rule was never finalized. Nevertheless, the Department of Justice issued a "field guidance" that instructed immigration officials to apply the "primarily dependent" definition set forth in the failed 1999 Rule to public charge determinations. Field Guidance on Deportability and Inadmissibility on Public Charge Grounds, 64 Fed. Reg. 28,689, 28,689–91 (May 26, 1999). Prior to the Rule at issue in this case, the 1999 Field Guidance has governed.

B.

1.

On October 10, 2018, DHS issued a notice of proposed rulemaking that signaled its intent to abandon the 1999 Field Guidance and adopt a new definition of "public charge" for purposes of admissibility determinations. *See* Inadmissibility on Public Charge Grounds, 83 Fed. Reg. 51,114 (October 10, 2018). DHS issued a final version of the Rule on August 14, 2019, *see* Inadmissibility on Public Charge Grounds, 84 Fed. Reg. 41,292 (August 14, 2019), which was initially scheduled to take effect on October 15, 2019.

The Rule made three relevant changes to the administration of the inadmissibility prong of the public charge provision. First, it replaced the 1999 Field Guidance's definition of "public charge," which asked whether an alien was likely to become "primarily dependent" on government assistance, with a durational threshold. Specifically, under the Rule, a "public charge" is defined as "an alien who receives one or more public benefits . . . for more than 12 months in the aggregate within any 36-month period." 84 Fed. Reg. at

41,501. Second, the Rule jettisoned the 1999 Field Guidance's exclusive focus on cash benefits, instead providing that both cash and certain in-kind benefits count as "public benefits" and can be considered in making public charge determinations. *See id.* Thus, an alien's receipt of noncash benefits such as Section 8 housing, SNAP (*i.e.*, food stamps), and certain Medicaid benefits would each count towards the 12-month threshold. *Id.* Third, the Rule enumerated a host of factors that DHS officials are to consider, in addition to those set forth in the INA, before determining whether a given alien is likely to become a "public charge." *See id.* at 41,504.

The process that DHS followed in promulgating the Rule was both thorough and procedurally sound. After issuing the requisite notice of proposed rulemaking in October 2018, DHS received 266,077 public comments on the Rule in just sixty days. 84 Fed. Reg. at 41,297. DHS then spent the next ten months refining the Rule and responding to those comments. Many of the changes implemented during this period addressed specific comments DHS had received, and its detailed responses spanned nearly 200 pages of the Federal Register.

Importantly, in formulating the Rule's durationally specific definition of "public charge," DHS did not simply pluck the operative time period out of thin air. Instead, it relied on several empirical analyses regarding patterns of welfare use in the United States, including studies conducted by the Census Bureau, the Department of Health and Human Services, and DHS itself. *See id.* at 41,359–62. According to DHS, those studies indicate that a substantial portion of individuals who receive public benefits do so for fewer than 12-months, *id.* at 41,360, and that those who receive such benefits over a longer period are

15

more likely to become "long-term recipients" of welfare, *id.* at 41,360. Thus, DHS concluded that the 12-of-36-month threshold would best effectuate its three objectives in replacing the "primarily dependent" standard, namely "(1) provid[ing] meaningful guidance to aliens and adjudicators, (2) accomodat[ing] meaningful short-term and intermittent access to public benefits, and (3) . . . not excus[ing] continuous or consistent public benefit receipt that denotes a lack of self-sufficiency." *Id.* at 41,361.

Before proceeding, a few points regarding the scope of the Rule bear noting. First off, the Rule retains the prevailing test that "[t]he determination of an alien's likelihood of becoming a public charge at any time in the future must be based on the totality of the alien's circumstances." 84 Fed. Reg. at 41,502. Next, the Rule governs only public charge determinations made in the context of admissibility; deportations, by contrast, would still be decided under the 1999 Field Guidance and the three-part *Matter of B-* test. *See id.* at 41,462. And lastly, the Rule applies only to public charge inadmissibility determinations made by DHS, not the other two executive agencies (the Department of State and the Department of Justice) that are tasked with making public charge decisions in related contexts. *Id.* at 41,294 n.3.

2.

DHS's promulgation of a final version of the Rule launched a flurry of litigation. The crux of most of these challenges was that the Rule violated both the Administrative Procedure Act ("APA") and the Fifth Amendment to the United States Constitution.

Initially, these suits met with some success. In the Ninth Circuit, two district courts issued preliminary injunctions barring enforcement of the Rule, one of which applied

16

nationwide, *see Washington v. United States Dep't of Homeland Sec.*, 408 F. Supp. 3d 1191, 1224 (E.D. Wash. 2019), and the other of which applied only to persons residing in certain California counties as well as a number of states and the District of Columbia, *see City & Cty. of San Francisco v. USCIS*, 408 F. Supp. 3d 1057, 1129–30 (N.D. Cal. 2019). A district judge in the Southern District of New York also issued two preliminary nationwide injunctions against the Rule, *see Make the Rd. New York v. Cuccinelli*, 419 F. Supp. 3d 647, 667–68 (S.D.N.Y. 2019), while another judge in the Northern District of Illinois enjoined enforcement of the Rule only within Illinois, *see Cook Cty., Illinois v. McAleenan*, 417 F. Supp. 3d 1008, 1030–31 (N.D. Ill. 2019).

But this run of preliminary injunctions did not last long. On December 5, 2019, the Ninth Circuit stayed the injunctions within its jurisdiction, concluding that "DHS has shown a strong likelihood of success on the merits, that it will suffer irreparable harm, and that the balance of the equities and public interest favor a stay" pending appeal. *City & Cty. Of San Francisco v. USCIS*, 944 F.3d 773, 781 (9th Cir. 2019). Though the Second and Seventh Circuits declined to follow suit, the Supreme Court eventually granted the government's emergency requests to stay the preliminary injunctions issued by both the Southern District of New York and the Northern District of Illinois. *See Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599 (2020); *Wolf v. Cook Cty., Illinois*, 140 S. Ct. 681 (2020). In so doing, five Justices of that Court necessarily concluded that the government had made "a strong showing that [it was] likely to succeed on the merits." *Nken v. Holder*, 556 U.S. 418, 434 (2009) (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)). Such a stay

17

would have been unlikely if not impossible had that showing not been made. DHS began enforcing the Rule on February 24, 2020.

## C.

In September 2019, plaintiffs CASA de Maryland, Inc. ("CASA"), Angel Aguiluz, and Monica Camaco Perez filed this lawsuit in the United States District Court for the District of Maryland. CASA is a non-profit organization based in Maryland that "offers a wide variety of social, health, job training, employment, and legal services to the immigrant communities in Maryland, Washington, D.C., Virginia, and Pennsylvania." J.A. 65. It claims to be the "largest membership-based immigrant rights organization in the mid-Atlantic region, with more than 100,000 members." *Id.* Aguiluz and Perez are both CASA members who immigrated to the United States as children. Defendants are federal officials charged with enforcing the Rule: Donald J. Trump, President of the United States; Chad Wolf, Acting Secretary of DHS; and Kenneth T. Cuccinelli II, Acting Director of United States Citizenship and Immigration Services. Each is sued in his official capacity.

Plaintiffs claim that the DHS Rule violates both the APA and the Fifth Amendment. Specifically, they assert that the Rule is "not in accordance with law" under § 706 of APA because (1) the term "public charge" "means 'primarily dependent on the government for subsistence,'" (2) this meaning is "unambiguous," and (3) as a result, "DHS lacks the statutory authority to reinterpret public-charge admissibility in a way that is contrary to that definition." J.A. 63. They also state the Rule is arbitrary and capricious, and violates the Due Process Clause and the Equal Protection Component of the Fifth Amendment.

18

In September 2019, plaintiffs moved for a preliminary injunction to block the Rule from going into effect, or, in the alternative, for an order pursuant to APA § 705 postponing the effective date of the Rule during the pendency of this litigation. Defendants opposed the motion and also argued that plaintiffs could not maintain this action because they lacked standing, fell outside the "zone of interests" protected by the public charge provision, and because their case was not ripe for adjudication. After briefing and oral argument, the district court granted plaintiffs' motion and enjoined defendants from enforcing the Rule nationwide. *Casa de Maryland, Inc. v. Trump*, 414 F. Supp. 3d. 760, 767 (D. Md. 2019).

At the outset, the district court concluded that CASA was an appropriate party to challenge the Rule. The court first held that CASA had Article III standing because the Rule could potentially harm its members, and CASA was thus forced "to divert resources that otherwise would have been expended to improve the lives of its members" to combat the Rule's assertedly deleterious effects. *Casa de Maryland*, 414 F. Supp. 3d at 773. Since it concluded that CASA had adequately alleged organizational standing, the district court did not decide whether the individual plaintiffs had standing or whether CASA had representational standing to sue on their behalf. The court also found that the case was ripe for review and CASA fell within the relevant statutory zone of interests. *Id.* at 774–78.

Turning to the merits, the district court held that CASA was likely to succeed on its APA claim that the Rule was "not in accordance with law."[3] In reaching this decision, it

---

[3] The district court accordingly did not consider plaintiffs' other APA or Fifth Amendment claims. *See Casa de Maryland*, 414 F. Supp. 3d at 784.

applied the familiar two-step *Chevron* framework for analyzing agency interpretations of statutory provisions. *See Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984). As part of this analysis, the district court considered various pieces of evidence regarding the meaning of the term "public charge," from the time that it first appeared in law in 1882 to the various legislative, executive, and judicial attempts to change or to interpret the provision in the many decades since. *Casa de Maryland*, 414 F. Supp. 3d at 784. According to the court, this evidence, taken together, established that "Congress has spoken directly to the issue here and precluded DHS's definition of Public Charge" such that the Rule failed at the first step of the *Chevron* analysis or, alternatively, that "the Public Charge Rule fails at *Chevron* Step II as an impermissible reading of the statute." *Id.* at 778. The district court also found that CASA satisfied the other requirements for preliminary injunctive relief under *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); specifically, that the organization was likely to suffer irreparable harm absent preliminary relief and, moreover, that the balance of equities and the public interest tipped in CASA's favor. *See Casa de Maryland*, 414 F. Supp. 3d at 785.

Finally, in terms of relief, the district court entered a preliminary injunction that applied nationwide, preventing defendants from enforcing the Rule against anyone. It provided three justifications for issuing such a broad remedy: (1) a nationwide injunction was necessary to provide complete relief to CASA because its members could be subject to public charge determinations outside of the district's geographic boundaries, (2) there is a particular need for uniformity in immigration law, and (3) that "the ordinary remedy in APA challenges to a rulemaking is to set aside the entire rule if defective." *Casa de*

20

*Maryland*, 414 F. Supp. 3d at 786–87.  For these same reasons, the district court also granted CASA's request to stay the effective date of the Rule during the pendency of this litigation.  *Id.* at 787–88.

On motion by the government, we stayed the district court's preliminary injunction by order dated December 9, 2019.  This appeal followed.

II.

We begin with the question of plaintiffs' standing.  "No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *Raines v. Byrd*, 521 U.S. 811, 818 (1997) (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 37 (1976)).  As such, before litigants can avail themselves of the judicial power, they must satisfy the familiar three-part test for standing.  A "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).  An organization like CASA "may suffer an injury in fact when a defendant's actions impede its efforts to carry out its mission." *Lane v. Holder*, 703 F.3d 668, 674 (4th Cir. 2012) (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)); *see also Warth v. Seldin*, 422 U.S. 490, 511 (1975).

The district court held that CASA had alleged such an organizational injury here and, because the other elements of standing are not in dispute, was able to bring this suit. The court reasoned that the DHS Rule impeded CASA's efforts to carry out its mission because the organization was forced to reallocate resources and, in turn, shift from an

"affirmative advocacy posture" (*i.e.*, advocating for certain policies) to a "defensive one" (*i.e.*, advising members on the Rule's impact). *Casa de Maryland, Inc. v. Trump*, 414 F. Supp. 3d 760, 771–73 (D. Md. 2019). The court also intimated that CASA's choice to divert these funds was not really voluntary, as the Rule's "dramatically more threatening" nature effectively forced its hand. *Id.* at 773.

This was error. Basic Article III principles as well as precedent from this circuit and the Supreme Court all preclude the notion that CASA has organizational standing here. In holding otherwise, the district court countenanced a virtually limitless view of Article III injury that gives short shrift to the separation of powers values that standing doctrine preserves. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013) (noting that standing "is built on separation-of-powers principles [and] serves to prevent the judicial process from being used to usurp the powers of the political branches").[4]

For starters, the district court's opinion cannot be squared with our decision in *Lane*. There, a gun-rights organization whose activities included advocacy as well as "education, research, publishing and legal action," tried to challenge a federal firearm statute. *Lane*, 703 F.3d at 671. The group alleged that it had suffered an Article III injury because it needed to divert resources in order to help its members navigate the new law, and thus could not spend those funds on other goals. *Id.* We disagreed for the simple reason that

---

[4] The dissent's suggestion that we cannot consider CASA's standing is simply incorrect. *See* Dissenting Op., *post* at 76 n.2. The party in *Little Sisters of the Poor Saints Peter and Paul Home v. Pennsylvania*, No. 19-431, 2020 WL 3808424, at *8 n.6 (U.S. July 8, 2020), was an intervenor at the appellate stage of the litigation, not a party on whose standing the district court erroneously predicated its jurisdiction.

voluntary "budgetary choices" like spending money on legal action instead of research are not cognizable Article III injuries. *Id.* at 675 (internal quotation marks omitted). A moment's reflection reveals why. "To determine that an organization that decides to spend its money on educating members, responding to members inquiries, or undertaking litigation in response to legislation suffers a cognizable injury would be to imply standing for organizations with merely 'abstract concern[s] with a subject that could be affected by an adjudication.'" *Id.* (quoting *Simon*, 426 U.S. at 26).

What held for the gun-rights organization in *Lane* holds for CASA here. Contrary to the district court's suggestion, the DHS Rule forced CASA to do absolutely nothing as a matter of law. As in *Lane*, CASA's unilateral and uncompelled response to the shifting needs of its members cannot manufacture an Article III injury.

To put a finer point on it, it is not relevant for Article III purposes whether CASA felt moved to act in a particular manner. It is axiomatic that "standing is not measured by the intensity of the litigant's interest or the fervor of his advocacy," *Valley Forge Christian Coll. v. Ams. United for Separation of Church and State, Inc.*, 454 U.S. 464, 486 (1982), and that "a plaintiff's voluntary expenditure of resources to counteract governmental action that only indirectly affects the plaintiff does not support standing," *People for the Ethical Treatment of Animals v. U.S. Dept. of Agriculture*, 797 F.3d 1087, 1099 (D.C. Cir. 2015) (Millett, J., dubitante). Accordingly, we did not bother to ask in *Lane* whether the gun-rights organization's activities changed one way or the other. Many statutes and regulations may spur private organizations to react to them in some fashion. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561–62 (1992). And a voluntary budgetary decision,

23

however well-intentioned, does not constitute Article III injury, in no small part because holding otherwise would give carte blanche for any organization to "manufacture standing by choosing to make expenditures" about its public policy of choice. *Clapper*, 568 U.S. at 402. We have never taken the demands of standing, and the core separation of powers principles upon which the doctrine is based, to be so easily circumvented or so readily checked-off.

Moreover, the district court's view of organizational standing is fundamentally at odds with Supreme Court precedent—in particular, *Havens Realty*. In that case, a group dedicated to promoting equal housing opportunities (HOME) brought a claim against an apartment complex under the Fair Housing Act. HOME, which was covered by the Act as an "association," claimed that it had suffered an injury because the complex was showing apartments only to white people. HOME averred that this directly frustrated its mission to connect minorities with housing because the complex owner (that is, a supplier of housing) was simply refusing to abide by the law. The Supreme Court agreed. Critically, the Court held that HOME adequately alleged Article III injury because the complex "perceptibly impaired HOME's ability to provide counseling and referral services" and frustrated its "role of facilitating open housing." *Havens Realty*, 455 U.S. at 379 & n.21. While the Court noted that HOME needed to divert resources as a result of these discriminatory practices, it cast HOME's injury in terms of its ability to *function*.

The injury in *Havens Realty* was different in kind from what is at issue here. Organizational injury, properly understood, is measured against a group's ability to *operate* as an organization, not its theoretical ability to *effectuate* its objectives in its ideal world.

24

Quite simply, nothing in the Rule directly impairs CASA's ability to provide counseling, referral, or other services to immigrants. Of course, we respect the fact that CASA feels strongly that it must reallocate resources to best serve its members amidst a changing legal landscape and that it would prefer to operate in an environment where the Rule does not exist. But untold numbers of organizations regularly voice dissatisfaction with public laws and actions that may affect their ordering of priorities in some way. Resource reallocations motivated by the dictates of preference, however sincere, are not cognizable organizational injuries because no action by the defendant has directly impaired the organization's ability to operate and to function. *See Whitmore v. Arkansas*, 495 U.S. 149, 155–56 (1990).

The district court, by contrast, gave *Havens Realty* an essentially boundless reading that wrongly brought the case into stark tension with core precepts of standing doctrine. On its view, *Havens Realty* supports organizational standing any time a group (1) alleges that a governmental action undermines its policy mission, and (2) spends some money in response to that action. *See Casa de Maryland*, 414 F. Supp. 3d at 770–74. But the Supreme Court has made clear that standing demands the same of organizations as it does of individuals. *See Havens Realty*, 455 U.S. at 378–79. For this reason, "an organization's abstract concern with a subject that could be affected by an adjudication does not substitute for the concrete injury required by Art[icle] III." *Simon*, 426 U.S. at 40. And, just like individuals, an organization cannot satisfy this "concrete injury" requirement through standalone philosophical objections to a law, *Sierra Club v. Morton*, 405 U.S. 727, 739 (1972), gripes with how the law is enforced against other persons, *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973), or decisions to voluntarily spend money to combat the effects

25

of a given policy, *Clapper*, 568 U.S. at 410–14. A reading of *Havens Realty* focused on operational harm—that is, the ability of an organization to function—comports with these principles. The district court's position, though, essentially waives them for any entity with a policy position and a dollar.

The "duty of . . . every judicial tribunal[] is limited to determining rights of persons or of property which are actually controverted in the particular case before it." *California v. San Pablo & T.R. Co.*, 149 U.S. 308, 314 (1893). In light of the above, it is plain that we cannot allow this case to proceed on the district court's theory of subject matter jurisdiction if we are to remain faithful to these fundamental principles. CASA has not suffered an organizational injury, and thus it lacks organizational standing to bring this case.

There remains the question of whether the two individual plaintiffs to this action possess standing to bring it or whether CASA has standing in a representational capacity. We could of course remand this issue for a determination on that score. That course of action, however, imposes large costs. It would impart to this case an up-and-down-the-ladder quality that would delay its resolution almost indefinitely on a matter where the district court itself reached the merits and where the parties have extensively briefed the issue and urged its timely resolution upon our court. The issue, moreover, is, as both the parties and the amici recognize, one of large importance and one on which we presume that we will not have the final word. The matter of the Rule's validity should be presented to the Supreme Court in as timely fashion as possible consistent with the considered views of an intermediate court.

With that in mind, we take stock of the fact that this court "review[s] judgments, not opinions" and therefore may affirm the district court's jurisdictional holding on alternative grounds. *Pashby v. Delia*, 709 F.3d 307, 322 (4th Cir. 2013) (internal quotation marks omitted). In light of the above, we choose to do so here. The record of this case makes plain that the two individual plaintiffs have standing to challenge the DHS Rule. They are two Deferred Action for Childhood Arrivals (DACA) recipients who plan to adjust their status in the future, J.A. 38, 43–44, and, more importantly, are presently forgoing specific financial resources (such as applying for student loans), J.A. 40, 45, out of concern that doing so would render them "public charges" at that later point. Unlike with CASA, this is the sort of concrete and particularized harm necessary to establish an Article III injury. The plaintiffs have also alleged sufficient facts to show that this injury is sufficiently actual or imminent, as they have explained how the Rule is having an immediate effect on their lives today, as they make specific plans in anticipation of adjusting their status in the future. *See Clapper*, 568 U.S. at 414 n.5; *see also Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 183–84 (2000). Lastly, the two plaintiffs meet the causation and redressability prongs of standing.[5] We therefore shall proceed to address the plaintiffs' arguments on the merits.

---

[5] We also find that the two plaintiffs fall within the relevant statutory zone of interests—an inquiry that the Supreme Court has stressed is "not meant to be especially demanding." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012) (quoting *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987)). As noncitizens presently residing in the United States who intend to adjust their status in the future, the individual plaintiffs are persons who will be directly regulated under the DHS Rule. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 130 (2014).

## III.

"A preliminary injunction is an extraordinary and drastic remedy; it is never awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 690–91 (2008) (internal quotation marks and citation omitted). To obtain a preliminary injunction, a plaintiff must "establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). We review a district court's decision to grant an injunction for abuse of discretion. *Pashby v. Delia*, 709 F.3d 307, 319 (4th Cir. 2013). We believe that the district court erred in this case because, above all else, the plaintiffs are not likely to succeed on the merits. As explained above, the same assessment underlay the Supreme Court's issuance of a stay of the injunctions of the Rule, and we think after careful review that the grounds are not there for contradicting the Supreme Court's assessment.

## A.

The INA states that any alien who the executive determines is "likely at any time to become a public charge is inadmissible." 8 U.S.C. § 1182(a)(4)(A). This case turns on the meaning of "public charge" and whether the Rule is based on a permissible construction of that term.

Plaintiffs maintain that it is not. In particular, they aver that "public charge" has always meant someone "primarily dependent" on the government for support, and that the DHS Rule would apply to aliens who fall well below that threshold. The government, by contrast, maintains that "public charge" has a broad meaning that has been flexibly

28

interpreted by the executive over time and can encompass individuals who rely on public benefits to meet their basic needs, even if those persons are not "primarily dependent" on welfare or other public aid. As noted, the district court sided with plaintiffs, reasoning that the Rule was "unambiguously foreclosed by Congress's intention." *Casa de Maryland v. Trump*, 414 F. Supp. 3d 760, 784 (D. Md. 2019) (internal quotation marks omitted). We think this was error.

Plaintiffs contend that their view of the public charge provision is the only correct one. But that cannot be right. The term is broad and even elusive enough to accommodate multiple views and meanings, as indeed it has since it first appeared in immigration law. The text, structure, and history of the INA in fact all indicate that the Rule before us rests on an interpretation of "public charge" that comports with a straightforward reading of the Act. Moreover, fundamental separation of powers principles, and the concomitantly limited role of the federal courts over sensitive matters of immigration policy, only buttress what traditional tools of statutory interpretation make clear: the DHS Rule is a lawful one.

1.

As always, we start with the text. While some version of a public charge provision has been a part of federal immigration law since 1882, Congress has never defined the term. When phrases used in a statute are undefined, "we look to the ordinary meaning of the term . . . at the time Congress enacted the statute." *Perrin v. United States*, 444 U.S. 37, 42 (1979). Congress enacted the INA in 1952. The ordinary meaning of "public charge" in 1952 was "one who produces a money charge upon, or an expense to, the public for support and care." *Public Charge*, *Black's Law Dictionary* (4th ed. 1951) (defining as

29

used in 1917 Immigration Act); *Black's Law Dictionary* (3d ed. 1933) (same); *see also* Arthur Cook et al., *Immigration Laws of the United States* § 285 (1929) (defining as person who needs "any maintenance, or financial assistance, rendered from public funds, or funds secured by taxation"). And "charge," in this context, meant a "cost" or "expense." *See, e.g.*, *Charge*, *The New Century Dictionary* (2d ed. 1946); *Webster's New Century Dictionary of the English Language* (1941).

The district court, though, took up a different starting point. It looked to the meaning of "charge" in 1882, the first year a public charge provision was included in federal law. The court, relying mostly on two contemporary dictionaries, reasoned that "charge" meant a "person or thing committed or entrusted to the care, custody, or management of another," *Casa de Maryland*, 414 F. Supp. 3d at 779 (quoting *Charge*, *Webster's Dictionary* (1886 ed.)), so "public charge" therefore meant a person who "the Government has taken care, custody, or management of," *id.* at 779. Put otherwise, the district court said, a "public charge" in 1882 meant something akin to a "pauper," and it has meant the same thing ever since. *Id.*

For starters, we strongly doubt that "public charge" has been consistently understood as synonymous with "pauper." *See, e.g.*, *Lam Fung Yen v. Frick*, 233 F. 393, 396 (6th Cir. 1916) ("It seems clear that the term 'persons likely to become a public charge' is not limited to paupers or those liable to become such."); *Matter of M-*, 2 I. & N. 131, 131 (BIA 1944) (holding someone *was* a public charge but was *not* a pauper); *Public Charge*, *Black's Law Dictionary* (4th ed. 1951) ("As so used, the term [public charge] is not limited to paupers or those liable to become such."); Stewart Repalje et al., *Dict. of Am. and*

30

*English Law* (1888) (defining "charge" as "an obligation or liability"); *see also* Richard A. Boswell, *Restrictions on Non-Citizens' Access to Public Benefits: Flawed Premise, Unnecessary Response*, 42 UCLA L. Rev. 1475, 1486 n.40 (1995) ("[T]he term 'public charge,' which was written into the statute over a hundred years ago, has had different meanings over this entire period of time."). Indeed, from 1891 to 1990, Congress listed both "public charge" and "pauper" in the same statutory provision. And it is a fundamental canon of statutory interpretation that courts, whenever possible, should give independent statutory terms independent meaning. *See, e.g.*, *Hibbs v. Winn*, 542 U.S. 88, 101 (2004).

In all events, the present structure of the INA confirms that "public charge" should be given its broad ordinary meaning, as understood when the INA was enacted in 1952. *See Gustafson v. Alloyd Co.*, 513 U.S. 561, 570 (1995). Most importantly, the INA is structured to give the executive discretion to administer the public charge provision, which undermines the idea that the term has the sort of fixed and circumscribed definition ascribed to it by the district court. As noted, the INA does not define the term "public charge," let alone contain anything like a "primarily dependent" standard within its text. Rather, it expressly entrusts the decision of who is a "public charge" to the "opinion of the [DHS Secretary]." 8 U.S.C. § 1182(a)(4)(A); *see also id.* § 1103(a)(1). Ordinarily, this sort of language indicates that the executive has extensive discretion over the relevant determination. *See Martin v. Mott*, 25 U.S. (12 Wheat.) 19, 31–32 (1827) (Story, J.). Especially so here, where Congress has baked discretion into the statutory scheme many times over. For instance, the INA lays out five non-exclusive factors that executive officials should look to when making public charge determinations, but also states that such

31

factors should be considered "at a minimum." 8 U.S.C. § 1182(a)(4)(B)(i). This reinforces the point that it is the executive which has the ultimate discretion under the INA over who is a "public charge" and what is most relevant to that decision. *See also id.* § 1103(a)(3) (giving DHS Secretary rulemaking authority). In other words, nothing about these broad grants of power suggests that the term must be read more narrowly than its ordinary meaning.

Surrounding sections of the INA point in the same direction. Take the sponsorship-and-affidavit scheme that Congress designed to work in conjunction with the public charge provision. Under this scheme, as a necessary condition for avoiding a public charge designation, many aliens must obtain sponsors, be it a family member or employer, who will provide a legally-enforceable "affidavit of support" on their behalf. *See* 8 U.S.C. §§ 1182(a)(4)(C)–(D), 1183a. An alien's sponsor must pledge "to maintain the sponsored alien at an annual income that is not less than 125 percent of the Federal poverty line," *id.* § 1183a(a)(1)(A), and reimburse the relevant government agency if the alien uses "any means-tested public benefit," *id.* § 1183a(a)(1)(B). Failing to obtain a sponsor renders a covered alien automatically inadmissible as a public charge, no matter his personal financial circumstances. *See id.* §§ 1182(a)(4)(C)(ii), (D).

This sponsor-and-affidavit scheme affirms that "public charge" should be given its ordinary meaning. The content of what is required by the affidavit—including both its minimum income and reimbursement guarantees—coupled with the fact it is required for many aliens, underscores that the public charge provision is naturally read as extending beyond only those who may become "primarily dependent" on public support. Indeed,

32

adopting plaintiffs' definition, as the district court did, would create an odd gap between the public charge provision and the sponsorship-and-affidavit system designed to accompany it. The clear object and effect of the sponsorship-scheme is to guarantee that aliens will be *self-sufficient* and not impose any meaningful burden on the public. But, on plaintiffs' view, the same Congress that fashioned this system (as well as every Congress since 1882) also believed that the public charge provision only applied (and could only apply) to aliens likely to become *primarily dependent* on public support. This does not fit; that is, it does not make sense that Congress designed a sponsorship-scheme focused on self-reliance as a necessary part of complying with a statutory provision concerned exclusively with primary dependence. It would be like an amusement park having parents sign a form attesting that their kids are five feet tall in order for them to get on rides that only require persons to be three feet. Giving "public charge" its ordinary meaning, however, avoids this sort of incongruity and allows both provisions to work together.

What is more, related immigration statutes support this reading of the public charge provision. *See* Felix Frankfurter, *Some Reflections on the Reading of Statutes*, 47 Colum. L. Rev. 527, 539 (1947) ("Statutes cannot be read intelligently if the eye is closed to considerations evidenced in affiliated statutes."). When Congress last amended the public charge provision, it also passed the Personal Responsibility and Work Opportunity Act of 1996 ("PRWOA"). The PRWOA barred most aliens from receiving many cash and noncash benefits for five to ten years, 8 U.S.C. §§ 1611–1613, 1641, and it established that an alien's income would include his sponsor's for the purposes of qualifying for other aid, *id.* § 1631(a)(1). Congress passed these provisions "in order to assure that aliens be self-

33

reliant" and "not burden the public benefits system." *Id.* §§ 1601(5), (4). Giving "public charge" its ordinary meaning brings that provision into line with this surrounding program and its stated goal that "aliens within the Nation's borders not depend on public resources to meet their needs." *Id.* § 1601(2)(A). Adopting plaintiffs' proposed definition, on the other hand, would give the public charge provision a notably more limited scope, distinct from similar provisions in related laws. We do not see anything in the text of these statutes to indicate that Congress understood the public charge provision to be such a circumscribed outlier.

In sum, the text, structure, and statutory context of the INA all confirm that "public charge" should be given its ordinary meaning; that is, someone who produces a money charge upon the public for support and care. Of course, this does not mean the public charge provision *must* apply as broadly as its ordinary meaning permits. Instead, as the text of the INA makes clear, the term enjoys, in practice, a certain ambiguity, giving the executive discretion over the type, amount, and duration of public assistance that will render someone a "public charge." But, at the same time, the term is unambiguous as to the statutory floor it sets for the executive; a floor that the judiciary is powerless to alter sua sponte.

In practical terms, what this means is that *both* the DHS Rule and the 1999 Field Guidance may be seen to rest on sound footing. While the two policies involve different levels of public benefits at which receipt would render someone a "public charge," both turn on, at the end of the day, aliens producing money charges upon the public for support and care. The fact that two administrations set this bar at different places does not bear on

34

the legality of each respective policy; rather, it underscores how the public charge provision's very flexibility was designed to work. In that light, the DHS Rule is plainly permissible. The Rule defines "public charge" as someone who is likely to receive certain public benefits for more than 12 months over any 36-month period; put otherwise, someone who is likely to produce a money charge upon the public for support over some period of time. This is all the INA requires.

Curiously, the district court seemed to put greater stock into what Congress did *not* pass. Specifically, the court relied heavily on two failed proposals that attempted to define "public charge": the first, from 1996, would have defined the term as an alien who received certain public benefits for 12 months over any 7-year period; and the second, from 2013, would have expressly extended the provision to include the use of noncash benefits. *See Casa de Maryland*, 414 F. Supp. 3d at 782–83. The DHS Rule, the court surmised, was essentially an attempt to get into law a definition of "public charge" that two prior Congresses had rejected. But the Supreme Court has often warned that "[f]ailed legislative proposals are particularly dangerous ground on which to rest an interpretation of a prior statute," and the district court's decision shows why. *Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 169–70 (2001) (internal quotation marks omitted). The never-enacted 1996 and 2013 proposals relied upon by the district court cut as much in the other direction. Indeed, they equally support the idea that Congress has long resisted enumerating a fixed definition of "public charge," and has instead preferred to entrust the executive with implementing the provision flexibly in accordance with its ordinary meaning and the national interest.

35

Similarly, the district court erred when it held up the Supreme Court's decision in *Gegiow v. Uhl*, 239 U.S. 3 (1915), as support for its claim that "public charge" should be read narrowly. The court, in short, read *Gegiow* to stand for the proposition that "public charge" must mean something akin to a "pauper"; that is, someone "destitute and unable to work." *Casa de Maryland*, 414 F. Supp. 3d at 781 (internal quotation marks omitted).

This reading of *Gegiow* is untenable. Even on its own terms, *Gegiow* has nothing to do with this case. There, the Court decided a "single question," and held that an alien could not be designated a "public charge" based on the local labor market to which he was headed, rather than his personal characteristics. *Gegiow*, 239 U.S. at 9–10. The Rule, which involves a totality-of-the-circumstances individualized inquiry, entirely complies with this holding. In all events, there is considerable doubt as to *Gegiow*'s continuing relevance, as Congress amended the Immigration Act two years later "to nullify [*Gegiow*'s] restrictive interpretation of the statute." *Matter of Harutunian*, 14 I. & N. Dec. 583, 587 (BIA 1974).

We recognize that the Rule before us is controversial. As in all matters of controversy, there are passionate pros and cons. Our inquiry, however, concerns not the wisdom of the Rule but its legality. As to that, the text and structure of the INA yield a clear answer: the term "public charge" is naturally read as meaning just that—someone who produces a money charge upon the public for support or care. And the DHS Rule comports with this reading.

2.

Perhaps in light of what the text and structure of the INA seem to compel, plaintiffs urge that we take a different tack and look to the history. As touched on above, plaintiffs' core argument is that "public charge" has meant the same thing from 1882 to present day: someone primarily dependent, for one reason or another, on the public for subsistence. According to plaintiffs, when Congress repeatedly reenacted the public charge provision without adding a definition of "public charge," it implicitly ratified this widely-shared view of what the term meant and accordingly created an enforceable gloss upon the law's text.

Of course, plaintiffs are right that when a statutory phrase has been "given a uniform interpretation by inferior courts or the responsible agency, a later version of that act perpetuating the wording is presumed to carry forward that interpretation." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 322 (2012); *see also Stokeling v. United States*, 139 S. Ct. 544, 551 (2019). But the Supreme Court has also stressed that Congressional reenactment of a glossed term cannot alter or overcome its plain meaning. *See, e.g.*, *Demarest v. Manspeaker*, 498 U.S. 184, 190 (1991).

At any rate, these sorts of implicit ratification arguments are tall orders. *See Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 650 (1990). Congress has never enacted the language plaintiffs now advance as the statute's sole and indisputable meaning. Before a court may infer an atextual gloss on a statute, the backdrop against which Congress was legislating must be settled and unambiguous. *Jama v. Immigration & Customs Enf't*, 543 U.S. 335, 349 (2005) (requiring, for judicial opinions, a "judicial consensus" that is "broad and unquestioned"); *FDIC v. Philadelphia Gear Corp.*, 476 U.S. 426, 437 (1986)

(requiring, for administrative practice, a "longstanding interpretation"). This condition flows directly from the separation of powers' command that the federal courts are to apply statutes, not build upon or augment them in some common law manner.

The district court overlooked this threshold requirement when it accepted plaintiffs' historical claim. The district court's core error was that it lost sight of fact that plaintiffs needed to show that "public charge" has had a uniform and fixed definition that amounted to "settled law" both when Congress enacted the INA and when it most recently amended the public charge provision. *Keene Corp. v. United States*, 508 U.S. 200, 212–13 (1993).

Plaintiffs cannot shoulder this concededly heavy burden. Indeed, executive and judicial practice from 1882 to the present rebuts any idea that "public charge" has been uniformly understood by either branch as pertaining only to those who are "primarily dependent" on public aid. We consider the practice of each in turn.

To begin with, if "public charge" had the sort of ubiquitous definition that plaintiffs claim, it seems that nobody told the branch tasked with implementing the provision. As then-INS General Counsel Charles Gordon put it in 1949, the provision has always been understood as "highly ambiguous" and, at times, has had the effect of "thrust[ing] upon the immigration officer's shoulders the mantle of prophecy." Charles Gordon, "Aliens and Public Assistance," *Immigration and Naturalization Service Monthly Review*, vol. VI, no. 9 (Mar. 1949), 116; *see also* Kim R. Anderson & David A. Gifford, *Consular Discretion in the Immigrant Visa-Issuing Process*, 16 San Diego L. Rev. 87, 124–25 (1978). And it seems that the practical ambiguity of the phrase remained constant for the next fifty years. For instance, even the 1999 Field Guidance, which is the rock upon which plaintiffs have

38

built their case, declared that the term was ambiguous and that guidance was "necessary" because of "confusion over the meaning of 'public charge.'" Field Guidance on Deportability and Inadmissibility on Public Charge Grounds, 64 Fed. Reg. 28,689, 28,689 (May 26, 1999); *see also* Inadmissibility and Deportability on Public Charge Grounds, 64 Fed. Reg. 28,676, 28,677 (May 26, 1999) (referring to the term as "ambiguous"). This is not good for plaintiffs' argument premised on everyone being in on the same understanding.

Further, as one would expect considering the evolving executive policies described above, *see* Part I.A *supra*, it is not possible to glean a longstanding "primarily dependent" standard from executive practice. For one, any express articulation of such a standard is conspicuously absent from pre-1999 immigration opinions. *See Matter of B-*, 3 I. & N. Dec. 323, 325 (1948) (noting that a definition of "public charge" was no more than "implicit" in two federal court decisions); *Matter of J-*, 2 I. & N. Dec. 99, 99 (1944) (emphasizing that an alien was "not shown to have been a recipient of public aid of any kind in the past"); *see also Matter of V-*, 2 I. & N. Dec. 78, 79–80 (1944); *Matter of H-*, 1 I. & N. Dec. 166, 167–68 (1941). And it does not seem that any such standard has been long followed on the ground, in the bulk of ordinary decisions that never reached judicial or formal executive review. *See* S. Rep. No. 99-132, at 47–48 (1985) (observing "the State Department and INS have interpreted 'public charge' to exclude persons receiving assistance through such programs as 'food stamps' and 'rent subsidies'"); Gordon, *supra*, at 116 (explaining "[n]o fixed standard thus can be established" for such decisions and "the standards applied [in 1949] are a bit more exacting, particularly during times of economic

dislocation"); Immigration Services, Annual Report of the Commissioner-General of Immigration to the Secretary of the Treasury 10 (1896) (recognizing "1,946 immigrants fell into temporary distress and became public charges").

All in all, before a federal court may infer that Congress has silently ratified an interpretation put forward by an executive agency, that interpretation must be discernible and longstanding. *See, e.g.*, *Young v. Cmty. Nutrition Inst.*, 476 U.S. 974, 983 (1986). Here executive practice reveals that the public charge provision has enjoyed an enduring ambiguity, as different administrations have built upon the INA's statutory baseline in different ways at different times. *See City and Cnty. of San Francisco v. USCIS*, 944 F.3d 773, 796–97 (9th Cir. 2019).

We turn next to judicial precedent—and here too plaintiffs come up short. Preliminarily, we note that our focus—like that of the district court, parties, and amici—is on cases decided between the initial enactment of the public charge provision in 1882 and the passage of the INA in 1952. *See, e.g.*, *Casa de Maryland*, 414 F. Supp. 3d at 780–81; Appellant's Opening Br. 28–32; Appellee's Response Br. 34–35; Brief of Immigration Law Professors as Amicus Curiae 7–15; Brief of United States House of Representatives as Amicus Curiae 8–9. Obviously, only those judicial opinions published prior to the INA's enactment would have been available to Congress when drafting that statute. As such, for Congress to have implicitly ratified a settled judicial interpretation of "public charge," that interpretation must be evident in pre-1952 caselaw. What is more, very few cases dealing with the public charge provision have been decided since 1952. Congress's decision to entrust public charge determinations to "the opinion of" the executive naturally

40

limited robust judicial review. *See* Immigration and Nationality Act, Pub. L. No. 82-414, tit. II, ch. 2, § 212, 66 Stat. 163, 183 (1952). Likewise, Congress has stripped the federal courts of jurisdiction to review many discretionary decisions by immigration officials, *see, e.g.*, 8 U.S.C. § 1252(a)(2)(B), which, in addition to limiting the number of reported opinions interpreting the underlying provisions, further reinforces the point that Congress intended such decisions to be made by the executive, not the courts.

That said, there is a notable absence of any express articulation of a "primarily dependent" standard in reported decisions over the relevant time-period. *See, e.g.*, *Skrmetta v. Coykendall*, 16 F.2d 783, 784 (N.D. Ga. 1926) (describing "public charge" as persons who cannot "maintain themselves in society by the ordinary means"); *In re Keshishian*, 299 F. 804, 805 (S.D.N.Y. 1924) (noting that "there must be evidence that [an alien is] likely to be supported at the expense of the public"); *In re Feinknopf*, 47 F. 447, 447 (E.D.N.Y. 1891) (observing that an alien "ha[d] not received public aid or support" at all). In fact, it was not uncommon for federal courts to look to dictionary definitions of "public" and "charge" *separately* when interpreting the provision, which would be quite curious if there was a settled judicial construction of the term out there, as plaintiffs insist. *See, e.g.*, *Ex Parte Horn*, 292 F. 455, 457 (W.D. Wash. 1923); *Ex Parte Machida*, 277 F. 239, 241 (W.D. Wash. 1921).

When courts *did* endeavor to define the term "public charge," they often adopted its ordinary meaning. *See, e.g.*, *Ex Parte Kichmiriantz*, 283 F. 697, 698 (N.D. Cal. 1922) ("[T]he words 'public charge,' as used in the Immigration Act [of 1917], mean just what they mean ordinarily; that is to say, a money charge upon, or an expense to, the public for

41

support and care."); *see also Dunn v. Bryan*, 299 P. 253, 256 (Utah 1931) (finding that "public charge" has this "well-defined meaning" from *Ex Parte Kichmiriantz*). And many scholars, noting these cases, followed suit. *See* Jane Perry Clark, *Deportation of Aliens from the United States to Europe* 110 (1931) ("The words 'public charge' mean a financial liability on, or expense to, the public for support and care."); Will Maslow, *Recasting Our Deportation Law: Proposals for Reform*, 56 Colum. L. Rev. 309, 340 (1956); Leo M. Alpert, *The Alien and the Public Charge Clauses*, 49 Yale L.J. 18, 23 (1939).

Judicial decisions thus cut against the idea that courts have uniformly applied a "primarily dependent" standard in practice. In fact, simpatico with the executive's approach, courts have often held that failure to repay upon demand a single specific expense charged to the public fisc could render an alien a deportable "public charge." *See, e.g.*, *Zurbrick v. Woodhead*, 90 F.2d 991, 991–92 (6th Cir. 1937) (holding someone regularly employed without a "blot upon her character" was a "public charge" because she could not pay hospital expenses). Moreover, for the first half of the twentieth century, when judicial review of public charge determinations was still common, there was a *circuit split* about the term's meaning; specifically, whether someone who was imprisoned could be designated a "public charge." *United States ex re. Lehtola v. Magie*, 47 F.2d 768, 770 (D. Minn. 1931) (detailing split). This does not augur well for the notion that "public charge" had a settled judicial meaning, let alone one focused solely on primary dependence. Recall that for a court to infer that Congress silently adopted a judicial interpretation of a statutory phrase, that interpretation must be the product of a "judicial consensus [that is]

42

broad and unquestioned." *Jama*, 543 U.S. at 349. It is not even close whether such a consensus existed around the standard plaintiffs champion.

While legislative history holds a precarious position as a source for statutory interpretation, the Supreme Court has made clear that, in the context of arguments like the one plaintiffs make here, the absence of evidence might be the evidence of absence. That is, if Congress decided to ratify some settled administrative or judicial interpretation of a statutory phrase, one would expect there to be some sign of it. *See Zenith Radio Corp. v. Hazeltine Research Inc.*, 401 U.S. 321, 336 n.7 (1971) (looking for "direct evidence" that Congress considered the interpretation). But the legislative record—in particular, the legislative history of the 1952 INA and the most recent public charge amendments—comes up empty. For plaintiffs, this is the ballgame. *See Brown v. Gardner*, 513 U.S. 115, 121 (1994).

Of course, Congress did enact the INA against some backdrop. But it was not the one that plaintiffs urge here, and the one that the district court adopted. Congress was expressly aware of many of the disagreements noted above and recognized that the public charge provision had been "left to the interpretation of the administrative officials and the courts." S. Rep. No. 81-1515, at 348–49 (1950). Critically, Congress understood that "courts have given varied definitions of the phrase" and "different consuls, even in close proximity with one another, have enforced standards highly inconsistent with one another." *Id.* at 347, 349 (internal quotation marks omitted). In light of *this* backdrop, the legislature made a conscious choice: keep "public charge" undefined and vest the executive branch with discretion as to how to best implement the provision, consistent with the national

43

interest. As the Senate Judiciary report for INA put it: "Since the elements constituting the likelihood of becoming a public charge are varied, there should be no attempt to define the term in the law, but rather to establish the specific qualification that the determination of whether an alien falls into that category rests with the discretion of the consular officers or the Commissioner." *Id.* at 349. Accordingly, Congress added in the 1952 INA that public charge determinations would turn on the "opinion" of the relevant executive officer. 8 U.S.C. § 1182(a)(4)(A).

The legislative history of the 1996 amendments to the public charge provision do nothing more for plaintiffs. It seems that at least some sponsors of the IIRIRA affirmatively rejected plaintiffs' "primarily dependent" definition. *See, e.g.*, 142 Cong. Rec. S4417 (daily ed. Apr. 30, 1996) (statement of Sen. Simpson) ("If the immigrant uses such taxpayer-funded assistance, he or she is a public charge. How else should the term 'public charge' be defined than someone who has received needs-based taxpayer-funded assistance?"). And the prior legislative debates do not reveal any indication that Congress was aware of plaintiffs' proffered interpretation. *See, e.g.*, 139 Cong. Rec. S1765 (daily ed. Feb. 18, 1993) (statement of Sen. Mitchell) ("Provisions in the act require applicants for visas to prove that they will not require public assistance or become a 'public charge.'"). Moreover, the Conference Report to the IIRIRA seems to endorse the ordinary meaning of "public charge," and insists that the provision had been *underenforced* in the context of deportations. *See* H.R. Rep. No. 104-828, at 241 (1996) (Conf. Rep.) ("Aliens who access welfare have been deportable as public charges since 1917. However, only a negligible number of aliens who become public charges have been deported in the last decade."). Put

plainly, whatever value legislative history may have here, it only reinforces the lawfulness of the Rule.

The district court agreed with plaintiffs that "public charge" has retained a well-known and fixed meaning for the last 138 years, so much so that DHS's interpretation of that term was foreclosed by the "unambiguously expressed intent of Congress"—an intent that Congress expressed, we suppose, through repeated silence. *See Casa de Maryland*, 414 F. Supp. 3d at 778 (internal quotation marks omitted). We do not see it. The only constant feature of the public charge provision seems to be its mutability, a trait that Congress has purposefully codified as a *feature* of our immigration law, not a bug. Of course, none of this means that the executive has free reign to cram whatever policy it wishes into the public charge provision. Its discretion is still limited by the plain text of the INA. But the executive's discretion over this provision cannot be restrained by adopting a fixed "primarily dependent" standard that has no basis in the text or history of that statute.

3.

The DHS Rule thus comports with the best reading of the INA—namely that Congress actively sought variability over time as different administrations responded to different exigencies and circumstances. To whatever extent this appeal presents a close question—and, again, we think it does not—*Chevron* makes the outcome clear. Under *Chevron*, courts must uphold an agency interpretation as long as it is a "permissible construction of the statute." 467 U.S. 837, 843 (1984). The DHS Rule satisfies this test.

45

As noted, the Rule made two substantive changes to the 1999 Field Guidance that was previously in place. First, it replaced the "primarily dependent" standard with a more concrete metric, defining "public charge" as an alien who "receives one or more public benefits for more than 12 months in the aggregate within any 36-month period." Inadmissibility on Public Charge Grounds, 84 Fed. Reg. 41,292, 41,297 (August 14, 2019). Second, the DHS Rule incorporated for the first time certain noncash federal benefits as part of its definition of "public benefit." *Id.*

These changes follow from a permissible construction of the INA. DHS's definition of "public charge" is clearly consistent, as mentioned, with at least "an ordinary understanding" of the term. *Babbitt v. Sweet Home Chapter of Comm's for a Great Or.*, 515 U.S. 687, 697 (1995). Further, the Rule facilitates the broader congressional policy goals contained in the INA and related immigration statutes: in particular, Congress's stated desire that "aliens within the Nation's borders not depend on public resources to meet their needs." 8 U.S.C. § 1601(2)(A); *see also Cuozzo Speed Techs., LLC v. Lee*, 136 S. Ct. 2131, 2142–44 (2016). Lastly, the DHS Rule fits comfortably with the surrounding structure of the INA. *See MCI Telecommunications Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 228–29 (1994). For example, in addition to the sections noted above, the Rule's decision to cover noncash benefits is supported by the fact that another provision of the INA bars DHS from "consider[ing] any benefits that the alien may have received" as part of its public charge determination if an alien "has been battered or subjected to extreme cruelty in the United States." 8 U.S.C. §§ 1182(s), 1641(c)(1)(A). Congress's use of "any" here would be odd if DHS *only* were permitted to consider cash benefits in its analysis.

All told, the text, purpose, and structure of the INA make clear that the DHS Rule is premised on a permissible construction of the term "public charge." To hold otherwise is a serious error in statutory interpretation. More fundamentally, though, it is also a broadside against separation of powers and the role of Article III courts.

The separation of powers concerns underlying *Chevron* are at their zenith in the context of immigration, a field that the Constitution assigns to the political branches. *See Harisiades v. Shaughnessy*, 342 U.S. 580, 596–97 (1952) (Frankfurter, J., concurring). The exercise of the federal immigration power is a "fundamental act of sovereignty," *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950), vested preeminently in and shared by the political branches. Specifically, this fount of authority "stems not alone from legislative power but is inherent in the executive power to control the foreign affairs of the nation," *id.*, such that when "Congress prescribes a procedure concerning the admissibility of aliens . . . it is not dealing alone with a legislative power" but is also "implementing an inherent executive power," *id.* When Congress chooses to delegate power to the executive in the domain of immigration, the second branch operates at the apex of its constitutional authority. *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 319–20 (1936).[6]

---

[6] To be sure, *Chevron* has been overused to enlarge the power of the administrative state, *Gutierrez-Brizuela v. Lynch*, 834 F.3d 1142, 1151–58 (10th Cir. 2016) (Gorsuch, J., concurring), and to incentivize open-ended delegations of power from Congress to the Executive, Neomi Rao, *Administrative Collusion: How Delegation Diminishes the Collective Congress*, 90 N.Y.U. L. Rev. 1463 (2015). But deference is plainly appropriate here where Congress has expressly and specifically delegated power to the executive in an area that overlaps with the executive's traditional constitutional function.

The other side of this coin is that the judicial role in overseeing the political branches' exercise of the federal immigration power is circumscribed. The Supreme Court has repeatedly emphasized that "[j]udicial deference in the immigration context is of special importance, for executive officials 'exercise especially sensitive political functions that implicate questions of foreign relations,'" *Negusie v. Holder*, 555 U.S. 511, 517 (2009) (quoting *INS v. Abudu*, 485 U.S. 94, 110 (1988)), while federal judges possess inherently limited competencies over this subject matter, *see Fiallo v. Bell*, 430 U.S. 787, 796 (1977). Immigration policy concerns not only the physical security of the country, but also the character and identity of the nation. Federal judges, drawn from one profession and lacking even a patina of democratic sanction, are ill-suited to supervise these issues and the difficult balances that inhere in them. Accordingly, we should be reluctant to disturb the authority expressly delegated to executive officials by Congress in this field. *See Knauff*, 338 U.S. at 542. Yet plaintiffs would have us barrel ahead as if we were sub silentio exempted from these settled axioms.

Properly evaluated, the DHS Rule is unquestionably lawful. Congress has delegated to the executive the power to implement a purposefully undefined provision of law in an area where the executive possesses inherent constitutional powers and unique structural competencies. To whatever extent the federal courts are empowered to review how the executive discharges this duty, the separation of powers demands careful deference from the judiciary and intervention, if at all, only in truly exceptional situations. This is not one of them.

## B.

In his fine dissenting opinion Judge King refers warmly to the Seventh Circuit's recent holding that the Rule is likely contrary to law. *See, e.g.*, Dissenting Op., *post* at 80 & n.4 (citing *Cook Cty. v. Wolf*, 962 F.3d 208 (7th Cir. 2020)). At the outset, both our sister circuit and our dissenting colleague make a critical concession that the term "public charge" is an ambiguous one. Dissenting Op., *post* at 80; *Cook Cty.*, 962 F.3d at 226. Ordinarily, such an acknowledgement of ambiguity would lead to considerable deference to the agency charged with implementing the statutory directive. *Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843–44 (1984). Far from following the usual course, however, those opinions declare that while the term "public charge" is ambiguous, it is somehow not ambiguous enough. *See* Dissenting Op., *post* at 98–99; *Cook Cty.*, 962 F.3d at 229. Our dissenting colleague's approach suggests different categories of ambiguity—a *Chevron* Step III for courts to determine whether maximum or moderate ambiguity is present in a given case. This multi-layering of ambiguity adds an additional element of complexity and subjectivity to a doctrinal area that has suffered no shortage of either.

The Seventh Circuit, in proceeding to *Chevron* Step II, identified a litany of faults with the Rule; but far from revealing the Rule as flawed, both our dissenting colleague's and the Seventh Circuit's opinions only underscored the significant difficulties with their own approaches. Indeed, Judge King's praise of the Seventh Circuit's reasoning is unsurprising as the two opinions suffer from many of the same infirmities.

Those difficulties are at least three in number. The first complication is that both opinions create more inconsistencies than they resolve and manufacture "floors" that are untethered from the statutory text. Second, both our dissenting colleague and the Seventh Circuit engage in sheer speculation about potential rules that do not exist, and the Seventh Circuit imagines prejudiced implementation that has not occurred. And third, they mistake policy unreasonableness for statutory unreasonableness. We address each of these problems in turn.

First, both the Seventh Circuit and dissenting opinions pick and scratch at the Rule in an effort to identify tensions with other provisions of immigration law and federal law generally. *See* Dissenting Op., *post* at 105–06; *Cook Cty.*, 962 F.3d at 227. Of course, there is no end of conceivable "tensions" one may find while rummaging through the vast and complicated array of federal enactments. Under that approach, there would never be a perfectly seamless whole as every rule creates some conceivable "tension" that determined judges can discover. To dig at the Rule and unearth tension is to announce that every rule will be doomed to fall short from the start.

Worse still, both opinions, that of Judge King and the Seventh Circuit, skate blithely over the tensions and inconsistencies that their own positions create. The dissent embraces the Seventh Circuit's divination of "a floor inherent in the words 'public charge.'" Dissenting Op., *post* at 98 (quoting *Cook Cty.*, 962 F.3d at 229). But this "floor" of benefits below which no one may be deemed a public charge is simply nowhere in the text itself. The statute contains no threshold of benefits—quantitative, qualitative, or durational—that one must accept before qualifying as a public charge. And even assuming that this floor

50

can be properly divined, it is unclear how an agency could determine what the floor even is or whether an alien is "significantly dependent" on the government. The exercise our dissenting friend envisions is one of pure guesswork.

Furthermore, the Seventh Circuit scarcely mentions what is in the text—such as the sponsorship-and-affidavit scheme, *Cook Cty.*, 962 F.3d at 222—which evinces Congress's intent "to aggressively protect the public fisc" and "is at odds with the view that [Congress] used the term 'public charge' to refer exclusively to primary and permanent dependence," *id.* at 246 (Barrett, J., dissenting). In emphasizing that immigration law allows aliens to receive *some* benefits at *some* points, both the Seventh Circuit and our dissenting colleague rush over statutory text and nuance in a hurry to invalidate the Rule. *See* Dissenting Op., *post* at 105–06 (citing *Cook Cty.*, 962 F.3d at 228 (majority opinion)). For example, aliens are in fact barred from receiving many benefits for their first five to ten years in the country. 8 U.S.C. §§ 1611–1613, 1641; *see also Cook Cty.*, 962 F.3d at 247 (Barrett, J., dissenting). And the benefits available to aliens before five years of residency—that the opinions allege create tension—are largely irrelevant to the public charge determination under the Rule. *See Cook Cty.*, 962 F.3d at 235 n.1.

The statutory availability of some, but not all, benefits is readily reconcilable with the Rule: Congress tasked the executive with barring entry to those who are likely to need public benefits but also provided a backstop for those who face setbacks that were unforeseeable on the front end. *See id.* at 247 (citing 8 U.S.C. § 1227(a)(5); Act of Mar. 3, 1891, ch. 551, § 11, 26 Stat. 1084, 1086); *see also id.* at 235 n.1 (citing Inadmissibility on Public Charge Grounds, 84 Fed. Reg. 41,292, 41,312 (Aug. 14, 2019) ("[The Rule's]

definition does not include benefits related exclusively to emergency response, immunization, education, or social services. . . .")); Inadmissibility, 84 Fed. Reg. at 41,482 ("[T]he [R]ule's definition of public benefit does not include emergency aid, emergency medical assistance, or disaster relief.")).  Moreover, the dissent and the Seventh Circuit paint with far too broad a brush in defining what constitutes a benefit.  *See* Dissenting Op., *post* at 105 n.14 (citing *Cook Cty*., 962 F.3d at 232 (majority opinion)).  The term "charge" has never involved government services like fire protection or public education, but rather has "always been associated with dependence on a particular category of government programs: those available based on financial need."  *Cook Cty.*, 962 F.3d at 250 (Barrett, J., dissenting).

In short, the "tensions" that the Seventh Circuit and our dissenting colleague manage to come up with are of a decidedly tangential variety, and inconsistencies in both approaches, not to mention the plain statutory language, are probative of the Rule's validity.

The second drawback to the dissent's and Seventh Circuit's approach lies in their willingness to indulge in speculation.  The Seventh Circuit suggests without a shred of evidence that the executive will apply the statutory factors—"age," "health," "family status," "assets, resources, and financial status," and "education and skills," 8 U.S.C. § 1182(a)(4)(B)—on the basis of racial or ethnic stereotypes.  *Cook Cty.*, 962 F.3d at 232.  And both that court and our dissenting colleague speculate on the horrors of the executive designating someone who receives "a single benefit on one occasion" as a public charge, *id.* at 229; *see also* Dissenting Op., *post* at 99–100, notwithstanding the fact that the Rule

52

is both durationally and quantitatively far removed from the sort of public charge penny recipient about which those opinions speculate in their hypotheticals. Indeed, such a rule is not before this court, and we reserve discussion of its legality if and when it is presented.

The third difficulty with the analyses is their confidence in themselves as experts in immigration policy. The Seventh Circuit in fact begins with a description of the values that an ideal rule, in that majority's view, ought to encapsulate. *Cook Cty.*, 962 F.3d at 214–15. Both opinions fault the Rule for DHS's ability to "stack benefits" and categorize non-cash public aid as a public charge. *Id.* at 229; *see also* Dissenting Op., *post* at 101. But there is nothing in the statutory language that precludes stacked or non-cash benefits from counting as public assistance. And history belies the notion that the form of benefit matters—in early twentieth-century cases, one kind of public assistance with which the public charge provision was concerned was institutionalization, a type of non-cash benefit. *See, e.g.*, *United States ex rel. Brugnoli v. Tod*, 300 F. 913 (S.D.N.Y. 1923), *aff'd*, 300 F. 918 (2d Cir. 1924) (considering institutionalization in the Manhattan State Hospital). Moreover, the Seventh Circuit feels that the Rule "unreasonably imposes substantially disproportionate consequences for immigrants[] compared to the supposed drain on the public fisc they cause." *Cook Cty.*, 962 F.3d at 229.

These observations as to the Rule's efficacy may or may not be valid, but they are blunt policy prescriptions that belong in a legislative hearing or notice-and-comment rulemaking, not in a judicial assault upon the Rule's validity. *See Kerry v. Din*, 135 S. Ct. 2128, 2136 (2015) (recognizing that immigration distinctions "are 'policy questions entrusted exclusively to the political branches of our Government'" (quoting *Fiallo v. Bell*,

430 U.S. 787, 798 (1977))). At bottom, our sister circuit's and dissenting colleague's claim of *statutory* unreasonableness is really a claim of *policy* unreasonableness, designed to position the courts as singular arbiters in a field for which their expertise is limited and their democratic imprimatur is non-existent.

In combination, these drawbacks confirm every fear that the judiciary is on its way to projecting a major voice in a field of law that has long been reserved to the politically accountable branches the Founders established in Articles I and II. *Cf. Chicago & Southern Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 111 (1948) (recognizing that "the very nature of executive decisions as to foreign policy is political, not judicial," and thus they "are wholly confided by our Constitution to the political departments of the government, Executive and Legislative"). The Seventh Circuit and the dissent envision an immigration policy that, quite apart from its conformity to the preferred policy of a particular court, is static rather than dynamic. They take an ambiguous term and attempt to apply a singular meaning to it, when in fact their analyses admit multiple—and indeed possibly revolving—meanings.

Congress envisioned that the executive would be able to adapt immigration policy to political expressions and changing circumstances. *See United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 543 (1950) (describing immigration as a field requiring "flexibility and the adaptation of the congressional policy to infinitely variable conditions" (quoting *Lichter v. United States*, 334 U.S. 742, 785 (1948))). The Seventh Circuit and the dissent ignore this arrangement and wring all flexibility out of national immigration policy. It is difficult to think that any approach more restrictive than the "primarily dependent" or

"significantly dependent" standard will ever be acceptable. Only more permissive will do. But this misses Congress's intention that there be room for both. Instead of the term's ambiguity allowing for flexibility on the part of the executive, our dissenting colleague and the Seventh Circuit artificially constrict the term and install rigidity, along with an incipient judicial primacy, as the burgeoning hallmark of federal immigration policy.

## C.

The plaintiffs are therefore unlikely to succeed on the merits because the DHS Rule is lawful. As the Supreme Court has noted, a likelihood of success on the merits is the most critical factor supporting issuance of a preliminary injunction, and that likelihood simply is not present here. *Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599 (2020); *see also Nken v. Holder*, 556 U.S. 418, 434 (2009). This is enough to reverse the district court's grant of a preliminary injunction. *Trump v. Hawaii*, 138 S. Ct. 2392, 2423 (2018). It is worth noting also that the other *Winter* factors reinforce the conclusion that the district court erred in granting the injunction here. *See Winter*, 555 U.S. at 20.

For one, CASA did not establish that it would be irreparably harmed in the absence of an injunction. As noted, CASA's purported injuries were not the product of the Rule's dictates, but of its own priorities and choices. This is not "irreparable harm" in any judicially-cognizable sense. The final two *Winter* factors also did not assist CASA's case. When the government is a party, these factors—the balance of the equities and the public interest—merge. The key flaw in the district court's reasoning here was its implicit assumption that the individual interest must always trump the general. But whether one agrees with the Rule or not, the government is asserting the significant interest of not

burdening the public fisc by admitting public charges—an interest that would be meaningfully harmed because of the difficulty, if not impossibility, of undoing the grants of permanent resident status that both Congress and the executive have found to be against the national interest. In this field of immigration and border integrity, the public interest can be vitiated when the legitimate expressions of the two political branches of government are disregarded by the branch whose experience and expertise is relatively slim and whose policy perspectives lack any democratic imprimatur.

* * *

We have no doubt that the "public charge" bar has been applied more narrowly in the past. After all, DHS engaged in an extensive notice-and-comment rulemaking to bring about a change in extant policy. But change in whatever direction is what Congress anticipated when it steadfastly refused to define or particularize the public charge provision. The only question before us is not whether DHS *should* have used its power in this fashion, but rather whether it *could* have. For the foregoing reasons, the answer to this question is clearly yes.

IV.

Alas, we wish we could say that this was the whole megillah. But the district court also erred in its choice of remedy. On this front, we review a decision to grant a preliminary injunction under a "particularly exacting" version of the abuse of discretion standard. *Pashby v. Delia*, 709 F.3d 307, 319 (4th Cir. 2013) (internal quotation marks omitted). And, critically, "an overbroad injunction is an abuse of discretion." *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1119 (9th Cir. 2009) (internal quotation marks omitted).

The injunction issued in this case was plainly overbroad. Rather than enjoin the defendants from applying the Rule to CASA and its members, the district judge instead chose to enter a so-called "nationwide" injunction, preventing enforcement of the Rule against *anyone*. It should not have done this.

A.

A nationwide injunction is a drastic remedy and it was plainly improper here.

The federal courts exercise "[t]he judicial power of the United States." U.S. Const. Art. III § 1. This is a significant but carefully circumscribed authority, the limits of which are cabined by both the Constitution and Congress. *Turner v. Bank of North America*, 4 U.S. (4 Dall.) 8, 10 (1799). Nationwide injunctions, by which a single district judge completely blocks the enforcement of a federal policy against everyone, transgress the bounds of that authority at least thrice over. *See Trump v. Hawaii*, 138 S. Ct. 2392, 2424–29 (2018) (Thomas, J., concurring); Samuel L. Bray, *Multiple Chancellors: Reforming the National Injunction*, 131 Harv. L. Rev. 417, 420–21 (2017) (hereinafter "Bray"). First, this capacious remedy, which has become common only recently, seriously contravenes traditional notions of the judicial role. Second, nationwide injunctions likely exceed the constitutional and statutory limits on the federal equity power. Finally, the third branch of our government is in the end a diverse and collective enterprise. A single trial judge of course most often makes the initial call, but to imbue that call with nationwide scope and power, even temporarily, elevates the individual over the collective in a fashion that shuts off other voices to the detriment of sound resolutions and decisionmaking.

57

1.

As the Supreme Court has emphasized, our "constitutionally prescribed role is to vindicate the individual rights of the people appearing before [us]." *Gill v. Whitford*, 138 S. Ct. 1916, 1933 (2018). Of course, specific cases can have general implications. But the sole duty of the federal courts is not to decide general questions for everyone, but rather to settle particular "cases" or "controversies" between particular parties. *See Ariz. Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 132 (2011) ("Under Article III, the Federal Judiciary is vested with the 'Power' to resolve not questions and issues but 'Cases' or 'Controversies.'"); *see also Summers v. Earth Island Inst.*, 555 U.S. 488, 492–93 (2009).

Our power to grant equitable remedies is commensurate with this duty. As Justice Gorsuch recently explained, "[e]quitable remedies, like remedies in general, are meant to redress the injuries sustained by a particular plaintiff in a particular lawsuit." *Dep't of Homeland Security v. New York*, 140 S. Ct. 599, 600 (2020) (Mem.) (Gorsuch, J., concurring). As such, Article III requires that injunctions be tailored to protect only the plaintiffs in a specific case from the defendants to that suit. *See* Bray at 469. And while it is true that even such plaintiff-protective injunctions may benefit non-parties, these benefits are purely "collateral[]" because the "judicial power exists only to redress or otherwise to protect against injury to the complaining party." *Warth v. Seldin*, 422 U.S. 490, 499 (1975).

Nationwide injunctions are plainly inconsistent with this conception of the judicial role and the proper scope of the federal courts' remedial power. A nationwide injunction, by its nature, extends relief far beyond the parties to an individual case. Indeed, by issuing such an injunction, a single district court, whose decisions are non-precedential in its own

58

circuit, does not simply resolve a given lawsuit, but rather decides a general question for the entire nation. And far from being precisely tailored to redress a particular plaintiff's injuries, the very purpose of a nationwide injunction is to protect *everyone* from the challenged policy. It is, to put it mildly, "hard to see how the court could still be acting in the judicial role of resolving cases or controversies" when it issues such a far-reaching and pervasive equitable remedy. *New York*, 140 S. Ct. at 600 (Gorsuch, J., concurring).[7]

2.

Nationwide injunctions also run afoul of the prescribed scope of our equitable power. Since the Judiciary Act of 1789 gave the federal courts jurisdiction over "all suits . . . in equity," 1 Stat. 73 § 11, the Supreme Court has consistently understood general statutory grants of equity jurisdiction to confer "authority to administer in equity suits the principles of the system of judicial remedies which had been devised and was being administered by the English Court of Chancery at the time of the separation of the two countries." *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 318 (1999) (quoting *Atlas Life Ins. Co. v. W.I. Southern, Inc.*, 306 U.S. 563, 568 (1939)). Any inherent equitable authority that the courts possess under Article III is likely bounded by the same. *Hawaii*, 138 S. Ct. at 2425–26 (Thomas, J., concurring); 1 John N. Pomeroy, *A Treatise on Equity Jurisprudence* § 294 (A.L. Bancroft & Co. 1881).

---

[7] A geographically-focused injunction is not a sound alternative to a nationwide injunction. *See* Bray at 422 n.19. A geographically-limited injunction suffers from the same infirmities as a nationwide injunction, albeit on a smaller scale, *i.e.*, it protects non-parties and purports to decide a general question of law rather than a specific dispute.

In practice, this means that the core doctrines of American equity—namely, principles of equity jurisdiction, procedure, and remedies—must be rooted in English tradition. *See Payne v. Hook*, 74 U.S. (7 Wall.) 425, 430 (1868) (holding that "the equity jurisdiction conferred on the Federal courts is the same that the High Court of Chancery in England possesses"); *Russell v. Farley*, 105 U.S. (15 Otto.) 433, 437 (1881) (noting that the default procedures to be applied in suits in equity are "the practice[s] of the High Court of Chancery in England"); *Boyle v. Zacharie*, 31 U.S. (6 Pet.) 648, 658 (1832) (holding that remedies must link back "to the practice of courts of equity in the parent country"). Thus, as relevant here, a federal court sitting in equity is empowered to grant only those remedies that could have been issued by the English Chancellor in 1789 or that have some clear analogue in traditional equity practice. *See Grupo Mexicano*, 527 U.S. at 318–19.

Nationwide injunctions are irreconcilable with these limitations, as they lack any basis in traditional equity practice. *New York*, 140 S. Ct. at 600 (Gorsuch, J., concurring). In eighteenth-century English equity "there were no injunctions against the Crown," or anything like a nationwide injunction. Bray at 425; *accord* 3 W. Blackstone, *Commentaries on the Laws of England* 428 (1768). At the Founding, the English Chancellor would issue injunctions to protect the immediate parties, and, at times, equity would extend relief to a "small and cohesive" group of persons who shared a common interest. Bray 425–27. But that was it. The thought that an injunction could extend to protect scores of non-parties was not contemplated; indeed, it was resolutely avoided. *Conway v. Taylor's Ex'r*, 66 U.S. (1 Black) 603, 632 (1861) (noting that a court of equity will not "go beyond the case before it").

Both Article III and federal statutes incorporated these limitations on the equity power. *See Hawaii*, 138 S.Ct. at 2427 (Thomas, J., concurring); *see also* Joseph Story, *Commentaries on Equity Pleadings* § 69 (1838). It is unsurprising then that nationwide injunctions have not existed in American jurisprudence for most of our history. Instead, until the mid-twentieth century, federal judges recognized that their ability to grant equitable relief was limited to the parties before them. *See* Bray at 428–37. And attempts by litigants to extend the judiciary's power to encompass universal relief were uniformly rebuffed. *See, e.g.*, *Perkins v. Lukens Steel Co.*, 310 U.S. 113, 117, 123 (1940); *Frothingham v. Mellon*, 262 U.S. 447, 487–89 (1923). As the Supreme Court explained in *Scott v. Donald*, 165 U.S. 107, 115 (1897), "[t]he theory . . . that the plaintiff is one of a class of persons whose rights are infringed and threatened, and that he so represents such class that he may pray an injunction on behalf of all persons that constitute it . . . is too conjectural to furnish a safe basis upon which a court of equity ought to grant an injunction."

The recent proliferation of nationwide injunctions plainly cannot be squared with these longstanding precepts, which are meant to cabin our discretion and limit application of the judicial power to actual legal disputes rather than overarching policy questions. And their widespread use also cannot be squared with the constitutional and statutory limitations on our equitable authority.

3.

The fundamental infirmity of the nationwide injunction is confirmed by how poorly it fits alongside related doctrines that also flow from the concept of "judicial power."

61

Take, for starters, Article III standing.  To maintain a cause of action in federal court, "a plaintiff must show that he is under threat of suffering 'injury in fact' that is concrete and particularized," and that threat must be "actual and imminent, not conjectural or hypothetical." *Summers*, 555 U.S. at 493.  Moreover, every plaintiff "bears the burden of showing that he has standing for each type of relief sought." *Id.*  Nationwide injunctions effectively vitiate this requirement by permitting a single plaintiff to obtain equitable relief on behalf of countless non-parties, wholly without inquiry into whether they have suffered or will imminently suffer any injury-in-fact.  But standing is not a clown car into which all interested parties may pile, provided the driver-cum-plaintiff has met its requirements.  On the contrary, "Article III does not give federal courts the power to order relief to any uninjured plaintiff." *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1053 (2016) (Roberts, C.J., concurring).  That nationwide injunctions almost certainly result in the federal courts doing just that should, at a minimum, raise doubts as to their propriety.

Relatedly, nationwide injunctions are incompatible with the well-recognized bar against litigants raising the rights of others.  Pursuant to third-party standing doctrine, "even when the plaintiff has alleged injury sufficient to meet the 'case or controversy' requirement, . . . the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights and interests of third parties." *Warth*, 422 U.S. at 499.  But by requesting a nationwide injunction, a plaintiff is by definition seeking to vindicate the legal rights of *all* third-parties who may be subject to the challenged policy.

A similar point is true with respect to the doctrines of ripeness and mootness.  Generally, federal courts adjudicate only those cases that are ripe, in that the relevant

"administrative decision has been formalized and its effects felt in a concrete way by the challenging parties," *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 807–08 (2003) (internal quotation marks omitted)*,* and that are not moot, which obtains "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome," *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) (internal quotation marks omitted). Once again, nationwide injunctions allow non-parties to slip the bonds of these requirements, as a single plaintiff who obtains nationwide relief has done so on behalf of innumerable non-parties whose claims may very well have been premature or long stale.

But the list of doctrinal inconsistencies does not end there. Not only do nationwide injunctions conflict with the foregoing justiciability rules, but they also cannot be reconciled with congressional policy regarding the availability of aggregate equitable relief in the federal courts. Congress has already created an avenue by which a group of litigants that share a common interest can obtain an injunction protecting the entire group—a class-action pursuant to Federal Rule of Civil Procedure 23(b)(2). Quite obviously, class actions are the appropriate way to resolve the small subset of cases in which an injunction protecting only the plaintiff could prove too narrow. *See Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486, 1501 (9th Cir. 1996) (recognizing "injunctive relief generally should be limited to apply only to named plaintiffs where there is no class certification"). And, unlike nationwide injunctions, Rule 23 injunctions have a clear analogue in traditional equity practice. Bray at 426 (analogizing to the device known as a "bill of peace"); *see also* 7A Charles Alan Wright et al., *Federal Practice and Procedure* § 1751, at 11 (3d ed. 2005).

The ready availability of nationwide injunctions is difficult to square with the policy choices embodied in Rule 23. Only those who can satisfy the rigorous requirements Congress imposed for class certification are eligible to avail themselves of Rule 23 injunctions. But nationwide injunctions allow plaintiffs to obtain the benefits of class-wide relief without ever satisfying these criteria. *See* Bray at 476. This makes no sense. Indeed, as the Seventh Circuit aptly put it, "[a] wrong done to plaintiff in the past does not authorize prospective class-wide relief unless a class has been certified. Why else bother with class actions?" *McKenzie v. City of Chicago*, 118 F.3d 552, 555 (7th Cir. 1997).

B.

*Even if* the federal trial courts somehow possessed the power to issue nationwide injunctions, the attendant practical consequences of this drastic and extraordinary remedy should restrict its use to the most exceptional circumstances. *See Monsanto Co. v. Geertson Seed Farms*, 561 U.S 139, 165 (2010). There is no doubt that "[t]hese injunctions are beginning to take a toll on the federal court system." *Hawaii*, 138 S. Ct. at 2425 (Thomas, J., concurring); *see also New York*, 140 S. Ct. at 600 (Gorsuch, J., concurring) (describing as "patently unworkable"). A survey of some of the bad effects brought about by the rise of nationwide injunctions shows just how ill-advised a remedy they have become.

To begin with, nationwide injunctions limit valuable "percolation" of legal issues in the lower courts. By entering a nationwide injunction, a district judge precludes the government's ability to bring enforcement actions pursuant to the challenged policy and simultaneously reduces prospective plaintiffs' incentives to file additional suits challenging that policy. In tandem, these effects reduce the likelihood that a given question

will be debated widely. But as the Supreme Court has recognized, it is generally "preferable to allow several courts to pass on a given [issue] in order to gain the benefit of adjudication by different courts in different factual contexts." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979); *see also Arizona v. Evans*, 514 U.S. 1, 23 n.1 (1995) (Ginsburg, J., dissenting). And the value of percolation is at its apex where, as here, "a regulatory challenge involves important or difficult questions of law." *Los Angeles Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644, 664 (9th Cir. 2011). Nationwide injunctions limit dialogue in the lower courts, favoring quick and uniform answers to the more deliberate—and likely more accurate—method of doctrinal development that is intended under our judiciary's very design. The class is called "The Federal Courts and the Federal System" for a reason.

Relatedly, nationwide injunctions promote sprints to the courthouse and rushed judicial decisionmaking, often under immense time pressure, based on expedited briefing, and in the absence of a factual record. *See New York*, 140 S. Ct. at 600 (Gorsuch, J., concurring). Nationwide injunctions are often issued early in the litigative process, meaning that both the district judge's initial decision to grant the injunction and any subsequent appeals of that decision will take place without a record. *See* Bray at 461–62. Moreover, an injunction completely blocking the implementation of a federal policy can wreak havoc on the executive's agenda, which in turn incentivizes immediate, emergency stay requests. And the urgent need for resolution of such consequential questions often forces the Supreme Court to initially consider a given legal issue on a stay motion. *Id.* Again, this is exactly what happened on this very question. *New York*, 140 S. Ct. at 599 (granting stay of nationwide injunction).

65

This helter-skelter behavior is not what our legal system was designed to encourage. Indeed, as much becomes obvious when one considers the structure of the federal judiciary itself. For starters, Congress deliberately created a system of regional courts of appeals whose decisions are not binding on one another. *Virginia Soc'y for Human Life, Inc. v. FEC*, 263 F.3d 379, 393 (4th Cir. 2001). The Supreme Court has recognized that the motivation behind limiting intercircuit stare decisis was to avoid the possibility that "the indiscreet action of one court might become a precedent," such that "the whole country [would be] tied down to an unsound principle." *Mast, Foos & Co. v. Stover Mfg. Co.*, 177 U.S. 485, 488 (1900). The doctrine of intercircuit nonacquiescence, which permits executive branch officials to continue enforcing a policy outside of a circuit in which it has been invalidated, flows directly from this rule. *See, e.g.*, *Johnson v. U.S. R.R. Ret. Bd.*, 969 F.2d 1082, 1093 (D.C. Cir. 1992). The Supreme Court has likewise recognized that the federal government is generally free to relitigate issues it has already lost, except against parties to such prior litigation. *See United States v. Mendoza*, 464 U.S. 154, 160–63 (1984). Finally, as for the district courts, a "decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case." *Camreta v. Green*, 563 U.S. 692, 709 n.7 (2011) (internal quotation marks omitted).

As should be apparent, these structural principles prioritize percolation, considered decisionmaking, and intercircuit dialogue over haste and uniformity. But nationwide injunctions lay waste to this finely reticulated system, transforming the non-precedential decision of a lone district judge into the law of the land, for circuits and citizens alike.

66

Perhaps most importantly, the growth of the nationwide injunction also risks the perception of the federal courts as an apolitical branch.  The availability of this sweeping remedy has enabled litigants to challenge nearly every major executive branch policy in federal court.  In effect, nationwide injunctions have "turn[ed] every individual plaintiff into a roving private attorney general," Michael T. Morley, *De Facto Class Actions?*, 39 Harv. J.L. & Pub. Pol'y 487, 527 (2016), which has, in turn, left the executive beholden to the whim of any single district judge, freed even from the constraints of collegial deliberation.

Unsurprisingly, given the enormous stakes associated with such lawsuits, plaintiffs seeking to block executive action via nationwide injunction are incentivized to forum shop with abandon.  *See Hawaii*, 138 S. Ct. at 2425 (Thomas, J., concurring); Bray at 457–61. This patently political manipulation of the judiciary undermines the public's confidence in the federal courts and casts judges as advocates for their favored policy outcomes.  What is more, because "plaintiffs generally are not bound by adverse decisions in cases to which they are not a party, there is a nearly boundless opportunity to shop for a friendly forum to secure a win nationwide." *New York*, 140 S. Ct. at 601 (Gorsuch, J., concurring).  In other words, while the government must win every challenge brought against a policy to ensure its implementation, prospective plaintiffs need only find a single sympathetic audience of one in order to secure complete victory.

This is nothing more than "government by injunction," *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 222 (1974) (internal quotation marks omitted), and a clear violation of the traditional judicial understanding that we are not "continuing

67

monitors of the wisdom and soundness of Executive action," *Hein v. Freedom From Religion Found., Inc.*, 551 U.S. 587, 612 (2007) (opinion of Alito, J.) (quoting *Allen v. Wright*, 468 U.S. 737, 760 (1984)). And that is not all. Indeed, along with what has been discussed, the list of negative consequences associated with nationwide injunctions seems virtually endless. *See, e.g.*, *California v. Azar*, 911 F.3d 558, 583 (9th Cir. 2018) (noting that nationwide injunctions may harm "non-parties who are deprived the right to litigate in other forums"); *United States v. AMC Entm't, Inc.*, 549 F.3d 760, 773 (9th Cir. 2008) (discussing risks to judicial comity); Getzel Berger, *Nationwide Injunctions Against the Federal Government*, 92 N.Y.U. L. Rev. 1068, 1087–90 (2017) (enumerating still more downsides). Among the greatest victims of this unfortunate practice will be the courts themselves.

C.

In light of the above costs, it is clear that, even assuming the federal courts have the power to issue nationwide injunctions, they should be handed down only in extraordinary circumstances. The district court rejected this limit by issuing such a remedy in this case.

To begin with, it is plain that a nationwide injunction would be wholly unnecessary to protect the rights of the only plaintiffs to this lawsuit who have standing, namely Aguiluz and Perez. As the Supreme Court has repeatedly cautioned, "[a] plaintiff's remedy must be tailored to redress the plaintiff's particular injury." *Gill*, 138 S. Ct. at 1934. Here, it is the real prospect of the Rule being enforced against them individually that gives rise to Aguiluz and Perez's Article III injuries. *See* Part II *supra*. Thus, an injunction preventing DHS from applying the Rule to either of them would fully redress their injuries. Blocking

68

the enforcement of the Rule against everyone provides absolutely no additional protection to the individual plaintiffs to this suit and would clearly be overbroad.

And even on the district court's view that CASA had standing to challenge the Rule, the decision to grant a nationwide injunction was still wrong. There is no reason—none—that the district court, if it felt the Rule unlawful, could not have issued a narrower injunction barring the federal government from enforcing the DHS Rule against CASA's members. And the arguments advanced to the contrary are unpersuasive. At bottom, the district court justified its remedy on the ground that uniformity is important to immigration law and anything other than a nationwide injunction would be impractical. This rationale is unpersuasive. First off, it lacks any limiting principle; after all, if a general interest in uniformity could sustain a nationwide injunction, then it would justify such a remedy in all cases when federal law is implicated. Further, the district court improperly stepped into the shoes of DHS and displaced our democratic process of governance when it insisted that a nationwide injunction was necessary for pragmatic reasons. This would be troubling enough in any context, but especially so in the area of immigration, where the executive branch holds inherent constitutional powers and the judiciary does not.[8]

---

[8] Equally unpersuasive is the district court's suggestion that the APA justifies its choice of remedy. True, the APA authorizes courts to "hold unlawful and set aside agency action" that is "not in accordance with law." 5 U.S.C. § 706(2)(A). But we have squarely rejected the view that this provision mandates the issuance of a nationwide injunction whenever a federal rule is held unlawful. *See Virginia Soc'y*, 263 F.3d at 393–94. In any event, the position that § 706 even authorizes, much less compels, nationwide injunctions is baseless. *See* Bray at 438 n.121; *see also* John Harrison, "Section 706 of the Administrative Procedure Act Does Not Call for Universal Injunctions or Other Universal Remedies," *Yale Journal on Regulation*, Notice & Comment (Apr. 12, 2020),

In sum, the district court compounded its error of granting relief with its choice of remedy. It could have awarded complete relief on its view of the merits with a far narrower remedy. It is beyond the power of any one person to set himself up as the arbiter of law in these entire United States. The trial court sits as the judge for the District of Maryland, a court that on its own terms and in its own right has earned the greatest respect. But it is not the district court for the District of the United States.

V.

This case is not about the propriety of any policy, but rather about the power of the federal courts. Immigration is a complex and controversial topic that arouses intense emotions on the part of many. On the one hand, immigration is indispensable to cultural diversity and national renewal, an economic engine that can serve to rejuvenate an aging workforce and to fulfill critical societal needs. On the other hand, it can in unrestricted numbers overwhelm the nation's capacity for assimilation and, if unlawful, undermine an indispensable sense of national sovereignty and a commitment to the rule of law. Where to strike the balance between these two valid and competing perspectives is no easy task— but a task that the Constitution principally assigns to the political branches.

---

https://www.yalejreg.com/nc/section-706-of-the-administrative-procedure-act-does-not-call-for-universal-injunctions-or-other-universal-remedies-by-john-harrison/. The APA was passed in 1946, seventeen years before the first nationwide injunction was issued by a federal court. That Congress would have implicitly codified such a radical departure from settled equity practice is quite illogical. *See Weinberger v. Romero-Barcelo*, 456 U.S. 305, 320 (1982) ("[A] major departure from the long tradition of equity practice should not be lightly implied.").

70

Those representative branches of government have struck this careful balance in the public charge provision of the INA. Congress made the decision that the executive was best positioned to define and implement the public charge provision, consistent with the term's ordinary meaning and the national interest. The essence of this choice turns on Congress's view that the public charge provision should function, at heart, like an accordion; to expand or contract depending on the nation's needs and a given administration's policy. At times a policy like the 1999 Field Guidance might be best; and, at other times, the DHS Rule might be preferable. But this is a call for the executive. For the judiciary to seize this decision for itself, and insist, where Congress did not, upon a crystalline meaning of "public charge" is not only to stretch our limited competencies beyond their bounds, but also, more fundamentally, to nullify the careful judgments of the people's representatives.

Of course, we take no position on the merits of the DHS Rule. Nor could we. The question before us today is whether the challenged action comports with law. It is plain that the answer here is yes. For the above reasons, we reverse the judgment and remand for proceedings consistent with this opinion.

REVERSED AND REMANDED

71

KING, Circuit Judge, dissenting:

The Massachusetts Constitution of 1780, in recognizing the critical importance of separation of powers, coined a phrase that has become a mantra of our constitutional republic: The government should be "of laws, and not of men." *See* Mass. Const. pt. 1, art. XXX (1780). The Constitution of the United States enshrines that indispensable ideal by creating a three-branch government with power divided among the branches. As part of that ingenious scheme of separated power, the Constitution vests legislative power solely in Congress. That means Congress alone — not the President and not the judiciary — holds the power to enact new statutes or alter existing ones.

Nevertheless, in these proceedings, the President, the Department of Homeland Security, and the other defendants (collectively, "DHS") have redefined the statutory term "public charge" — far beyond the limits set by Congress — to narrow the protections afforded by our immigration system. That executive overreach led the district court to preliminarily enjoin the implementation of DHS's new definition of "public charge." *See Casa de Maryland, Inc. v. Trump*, 414 F. Supp. 3d 760 (D. Md. 2019). Our panel majority, however, has now acquiesced in DHS's new definition of "public charge" and condemned the district court for its efforts to keep DHS in check.

The majority expresses reticence to question DHS on this immigration matter, decreeing that unelected federal judges lacking expertise in such matters should steer clear. But this is not a matter of political choice regarding immigration policy; it is a matter of statutory interpretation, which falls within the exclusive bailiwick of the judiciary. *See Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803) ("It is emphatically the province

72

and duty of the judicial department to say what the law is."). And when interpreting statutes, it is our duty to ensure that the coequal branches of our government do not transgress the bounds of their authority. To be sure, whether the national interest is best served by a broad or narrow reading of the term "public charge" is not our concern. But whether the executive has ventured beyond the statutory bounds staked out by the legislative branch is emphatically our concern. In the circumstances of this case, the judiciary is duty bound to support the separation of powers. I therefore write separately and dissent.

## I.

In August 2019, DHS promulgated an administrative rule (the "DHS Rule" or the "Rule") — pursuant to its rulemaking authority under the Immigration and Nationality Act (the "INA") and the Administrative Procedure Act (the "APA") — purporting to interpret and apply an INA provision that governs the ability of an "alien" deemed "likely at any time to become a public charge" to gain admission to the United States or to adjust an immigration status. *See* 8 U.S.C. § 1182(a)(4) (the "Public Charge Statute").[1] Historically, public charge provisions, including the Public Charge Statute, applied only to aliens likely to be significantly dependent on the government. In other words, the acceptance of

---

[1] I use "Public Charge Statute" to refer to the current public charge provision in the INA. Other references to public charge provisions relate to earlier iterations thereof. And in keeping with the language of the INA, I use the term "alien" to describe those noncitizens subject to the Public Charge Statute. *See* 8 U.S.C. § 1101(a)(3) (defining the term "alien" as "any person not a citizen or national of the United States").

73

temporary, supplemental benefits was insufficient to render an alien excludable as a public charge.

But the DHS Rule changed that settled understanding by dramatically redefining the term "public charge." Under the Rule, an alien who might receive, at any point in his life, certain supplemental public assistance for 12 months within a 36-month period is excludable from this country as an alien likely to become a public charge. In addition, each discrete benefit received is counted as a full month of benefits, so that accepting three different types of benefits in a single month (e.g., housing, nutrition, and medical benefits) is counted as accepting three months of benefits. Accordingly, an alien will be declared likely to become a public charge if he might receive just a few months' worth of supplemental benefits at any point in his life.

In light of the DHS Rule's 2019 redefinition of the term "public charge," the plaintiffs filed this case in the District of Maryland. The plaintiffs include Angel Aguiluz and Monica Camacho Perez, two individuals who immigrated to the United States as children, plus CASA de Maryland, Inc., an immigrant rights organization with over 100,000 members that focuses on proactive outreach to improve the quality of life in immigrant communities of Maryland, Virginia, the District of Columbia, and Pennsylvania. In their complaint, the plaintiffs challenge the Rule on the ground that its redefinition of "public charge" is antithetical to the Public Charge Statute and should thus be set aside as not "in accordance with law" under the APA. *See* 5 U.S.C. § 706(2)(A). More specifically, the plaintiffs allege that all the typical tools of statutory construction

74

reveal that the term "public charge," as used in the Public Charge Statute, has a well-understood meaning that conflicts with the Rule.

Contemporaneous with the filing of their complaint, the plaintiffs moved the district court to preliminarily enjoin DHS from implementing the Rule. The plaintiffs contended that they satisfied each of the four factors essential to securing a preliminary injunction. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) ("A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."). After confirming that CASA has Article III standing as an organization to pursue the plaintiffs' APA claim, the court determined that the Rule should be preliminarily enjoined on a nationwide basis.

DHS noted this interlocutory appeal and launches a dual attack against the preliminary injunction. First, DHS contends that the injunction is ultra vires because CASA lacks standing to sue and CASA's interests fall outside of the zone of interests protected by the Public Charge Statute. Second, DHS argues that the district court erred in enjoining the Rule because its definition of the term "public charge" is lawful and, in any event, the award of injunctive relief is overbroad.

The panel majority today rules that CASA lacks Article III standing to contest the DHS Rule. On the other hand, the majority recognizes that the individual plaintiffs possess the necessary Article III standing. The majority also reverses the preliminary injunction, sanctioning the Rule's redefinition of "public charge" and concluding that the plaintiffs

have satisfied none of the four preliminary injunction factors.  Finally, after invalidating the injunction, the majority criticizes the injunction's nationwide scope.

## II.

In reversing the district court, the panel majority erroneously decides numerous legal issues.  First, the majority has erroneously ruled that CASA lacks Article III standing.  Second, my colleagues have improperly defined the statutory term "public charge," thereby erroneously ruling that the plaintiffs are not likely to succeed on the merits.  Third, the majority has erroneously concluded that the plaintiffs have not satisfied the remaining preliminary injunction factors and that the nationwide scope of the injunctive relief is improper.  As explained below, I dissent from all of those rulings.

### A.

At the outset, although the panel majority is correct to rule that the individual plaintiffs possess Article III standing, my friends err in concluding that CASA lacks standing.[2]  Simply put, by alleging in the complaint that it must spend significant resources to counter the effects of the DHS Rule and that the Rule precludes it from undertaking its core advocacy mission, CASA sufficiently alleges a "concrete and demonstrable injury to [its] activities[,]" paired with a "consequent drain on [its] resources."  *See Havens Realty*

---

[2] Aside from erring in its analysis of CASA's Article III standing, the majority errs by considering that issue at all, having recognized the individual plaintiffs' standing.  *Cf. Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, No. 19-431, slip op. at 13 n.6 (U.S. July 8, 2020) (ruling that court erred in inquiring into Article III standing of intervenor organization, in that another party seeking same relief possessed standing).

76

*Corp. v. Coleman*, 455 U.S. 363, 379 (1982); *see also Cook Cty., Ill. v. Wolf*, 962 F.3d 208, 218-19 (7th Cir. 2020) (concluding that Illinois immigrant rights organization claiming similar organizational injuries possessed Article III standing to challenge DHS Rule). The Supreme Court requires nothing more — particularly at this stage of the proceedings, when CASA's standing-related allegations must be accepted as true. *See Deal v. Mercer Cty. Bd. of Educ.*, 911 F.3d 183, 187 (4th Cir. 2018).

In reaching its improper conclusion that CASA lacks Article III standing, the majority twice errs. First, the majority misconstrues the Supreme Court's *Havens Realty* decision. In so doing, the majority excoriates the district court for giving *Havens Realty* an "essentially boundless reading" that would support "organizational standing any time a group (1) alleges that a governmental action undermines its policy mission, and (2) spends some money in response to that action." *See ante* 25. But the test decried by my good friends of the majority is the very test for organizational standing devised by the *Havens Realty* Court. As the Court related, a "concrete and demonstrable injury to the organization's activities — with the consequent drain on the organization's resources — constitutes far more than simply a setback to the organization's abstract social interests." *See Havens Realty*, 455 U.S. at 379. In such a situation, the Court explained, there is "no question that the organization has suffered injury in fact." *Id.* So, despite what the majority says, if an organization's core policy mission is undermined by allegedly unlawful governmental action and it must spend money in response thereto, the organization has suffered a cognizable Article III injury.

77

Second, the majority minimizes CASA's injuries to bring them in line with our decision in *Lane v. Holder*, 703 F.3d 668 (4th Cir. 2012). To be sure, we ruled in *Lane* that the plaintiff organization did not suffer an organizational injury for purposes of standing because its sole allegation was that a new federal law caused a drain on its resources. *Id.* at 675. In so ruling, we explained that a "mere expense" resulting from the voluntary shift in an organization's resources is not a sufficient injury to the organization because it "results not from any actions taken by the defendant, but rather from the organization's own budgetary choices." *Id.* (internal quotation marks and alterations omitted). Importantly, however, we predicated our *Lane* decision on the fact that the organization had alleged *only* that the new law resulted in a voluntarily expenditure of its resources. *Id.* at 671. Put another way, the organization did not allege that the new law impaired its organizational mission.

In these proceedings, CASA claims that the DHS Rule both impairs its organizational mission *and* causes it to divert resources from that mission. Together, those harms yield a cognizable organizational injury sufficient for CASA's Article III standing. *See Havens Realty*, 455 U.S. at 379 (ruling that broad allegations of frustration of organizational purpose in complaint were sufficient to establish injury-in-fact at pleading stage).[3]

---

[3] Although the majority does not reach the issue, I am satisfied that CASA's interests fall within the zone of interests protected by the Public Charge Statute such that it can assert its claim against the DHS Rule under the APA. *See Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153 (1970); *see also Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012) (observing that the "zone of

78

B.

I now turn to the panel majority's reversal of the district court's preliminary injunction barring implementation of the DHS Rule. Like the majority, my focus today is primarily on the most important preliminary injunction factor — the likelihood that the plaintiffs will succeed on the merits of their claim that the Rule is "not in accordance with law" because it defines the term "public charge" contrary to the Public Charge Statute. *See* 5 U.S.C. § 706(2)(A).

In evaluating the DHS Rule's lawfulness, we employ the familiar two-step framework for evaluating federal agency rulemaking set forth by the Supreme Court in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). Step one of *Chevron* requires using all the tools of statutory construction to evaluate whether the Public Charge Statute provides an unambiguous definition of the term "public charge." If so, we are bound to give effect to that definition and must set aside the Rule if it conflicts therewith. If not, however, we proceed to step two of *Chevron* and evaluate whether the Rule's definition of "public charge" is reasonable.

The district court concluded that the DHS Rule fails both *Chevron* steps and that the plaintiffs are thus likely to succeed on the merits of their claim that the Rule is unlawful. The majority, however, concludes that the plaintiffs are not likely to succeed on the merits because "[t]he term ['public charge'] is broad and even elusive enough to accommodate

---

interests" test "is not meant to be especially demanding" and that Congress's "evident intent when enacting the APA [was] to make agency action presumptively reviewable" (internal quotation marks omitted)).

79

multiple views and meanings," *see ante* 29, and because "the text, purpose, and structure of the INA make clear that the DHS Rule is premised on a permissible construction of the term 'public charge,'" *id.* at 47. A contrary ruling, decrees the majority, would be a "serious error in statutory interpretation." *Id.*

Since 1882, however, the statutory term "public charge" has consistently described aliens significantly dependent on the government. Nevertheless, I am willing to assume for this appeal that some measure of ambiguity inheres in the meaning of "public charge," as used in the Public Charge Statute. I thus would not resolve the plaintiffs' challenge to the DHS Rule at *Chevron*'s first step and would instead proceed directly to its second step. There, I would rule that, in light of the statutory context and the history of the term "public charge," the Rule's definition is far too broad and ventures well outside the bounds of any reasonable construction of the term. Indeed, as the Seventh Circuit recently concluded, the Rule's definition of "public charge" "does violence to the English language and the statutory context." *See Cook Cty.*, 962 F.3d at 229.[4]

---

[4] As related by the well-reasoned *Cook County* majority opinion in early June, the DHS Rule has been contested in district courts in New York, California, Washington, and Illinois, plus in Maryland as part of these proceedings. *See* 962 F.3d at 217-18. Without exception, each district court to consider the Rule preliminarily enjoined its implementation. *Id.* at 217. And the Seventh Circuit affirmed the injunction entered by the district court in the Northern District of Illinois. *Id.* at 234. Against this authority, the majority today is the first court in the nation to overturn a preliminary injunction that prohibited implementation of the Rule.

1.

The Public Charge Statute provides, in relevant part, as follows: "Any alien who . . . in the opinion of the Attorney General at the time of application for admission or adjustment of status[] is likely at any time to become a public charge is inadmissible." *See* 8 U.S.C. § 1182(a)(4)(A).[5]  It also specifies a non-exhaustive list of factors that immigration officials are obliged to consider in determining whether an alien is likely to become a public charge. Those factors include the alien's (1) age; (2) health; (3) family status; (4) assets, resources, and financial status; and (5) education and skills. *Id.* § 1182(a)(4)(B)(i). And the Public Charge Statute allows those immigration officials to consider whether the alien has an "affidavit of support." *Id.* § 1182(a)(4)(B)(ii); *see also* 8 U.S.C. § 1183a(a)(1)(A) (providing that an "affidavit of support" is a legally enforceable contract in which a "sponsor agrees to provide support to maintain the sponsored alien at an annual income that is not less than 125 percent of the Federal poverty line").

Although the Public Charge Statute does not explicitly define — and has never defined — the term "public charge," that circumstance does not give the term limitless meaning. After all, the Supreme Court has instructed the inferior courts to survey the full statutory landscape when seeking to discern Congress's intention regarding a given provision. *See Chevron*, 467 U.S. at 843 n.9. I now undertake that task.

---

[5] In 2002, Congress transferred the power to make inadmissibility determinations from the Attorney General to the Secretary of Homeland Security. *See* 8 U.S.C. § 1103(a).

81

a.

Congress first established a public charge provision in 1882.[6] Although the 1882 statute did not define the term "public charge," the text and history of the statute shed light on the meaning of the term. To that end, the 1882 statute allowed the authorities to examine vessels arriving in the United States and to prohibit from landing "any convict, lunatic, idiot, or any person unable to take care of himself or herself without becoming a public charge." *See* Act of Aug. 3, 1882, ch. 376, § 2, 22 Stat. 214, 214 (1882). On its face, the 1882 statute thus excluded from our country those noncitizen immigrants who would consume a significant amount of governmental resources — that is, noncitizen immigrants with a condition or status that rendered them unable to care for themselves or those subject to government confinement. As detailed below, that construction is confirmed by contemporary dictionary definitions, other statutory provisions, legislative history, and judicial decisions.

To begin, Webster's 1828 American Dictionary of the English Language provides two relevant definitions of the term "charge" — both of which indicate that the term described someone dependent on, or under the primary care of, another. Those definitions are: (1) "That which is enjoined, committed, entrusted or delivered to another, implying care, custody, oversight, or duty to be performed by the person entrusted"; and (2) "The

---

[6] The panel majority insists that a review of the statutory history should begin in 1952, the year Congress enacted the first iteration of the INA. But when Congress created the public charge provision in that legislation, it did not write on a clean slate. By 1952, the term "public charge" had already amassed seventy years' worth of meaning.

person or thing committed to anothers [sic] custody, care or management; a trust." *See*

*Charge*, Webster's Dictionary (1828 online ed.), http://webstersdictionary1828

.com/Dictionary/charge (last visited June 30, 2020).

Importantly, Webster's 1828 dictionary provides the most contextually appropriate definition of "charge" — that is, a person being the charge of someone or something (as opposed to, for example, an individual who merely imposes a charge upon another). Moreover, Webster's 1828 dictionary is the gold standard, as that publication contained "approximately 70,000 entries and definitions that were models of clarity and conciseness." *See* Samuel A. Thumma & Jeffrey L. Kirchmeier, *The Lexicon Has Become a Fortress: The United States Supreme Court's Use of Dictionaries*, 47 Buff. L. Rev. 227, 238 (1999) (internal quotation marks omitted); *see also* Gregory E. Maggs, *A Concise Guide to Using Dictionaries from the Founding Era to Determine the Original Meaning of the Constitution*, 82 Geo. Wash. L. Rev. 358, 389 (2014) (explaining that over time "the quality of [Webster's 1828 dictionary] became appreciated" and that the "Supreme Court cites this dictionary often as evidence of the original meaning of the Constitution").

The overall structure of the 1882 statute also indicates that the public charge provision was meant to exclude from the United States only those unable to care for themselves without significant government assistance, not simply those in need of some public aid. To that end, the statute provided for the collection of "a duty of fifty cents" for each noncitizen immigrant who arrived at a United States port. *See* Act of Aug. 3, 1882, ch. 376, § 1, 22 Stat. at 214. Once collected, that duty was to be paid "into the United States Treasury, and . . . used, [inter alia,] . . . for the care of immigrants arriving in the

United States, for the relief of such as are in distress." *Id.* The statute also authorized the Secretary of the Treasury to contract with state and local officials "to provide for the support and relief of such immigrants [arriving at United States ports] as may fall into distress or need public aid." *Id.* § 2, 22 Stat. at 214. Accordingly, the prospect of needing some public aid did not — standing alone — render an arriving immigrant an inadmissible public charge.

Relevant legislative history further confirms that a noncitizen immigrant could not be declared a public charge predicated solely on his acceptance of any quantum of public aid. For example, in an 1882 debate in the House of Representatives, New York Congressman John Van Voorhis, one of the architects of the 1882 statute, warned of a perceived and troubling trend in immigration. *See* Anne Fleming, *The Public Interest in the Private Law of the Poor*, 14 Harv. L. & Pol'y Rev. 159, 169 (2019). According to Van Voorhis, the decisions of other countries to send "[t]housands of paupers, idiots, lunatics, criminals, and accused persons [to the United States] . . . for the sole purpose of shifting onto this country the expense of supporting them" posed a grave danger. *See* 13 Cong. Rec. 5088, 5108 (June 19, 1882). But even as Van Voorhis warned of the perils inherent in admitting such individuals into the country, he explained — in advocating for the creation of the previously mentioned immigrant fund — that the United States has historically provided support to arriving immigrants. More specifically, Van Voorhis said that arriving immigrants "in distress . . . [will be] furnished with the needed aid . . . [and] provided for in a manner suitable to their several cases . . . [because it] is not the design of [the 1882 statute] to check immigration, but to continue the beneficent supervision

84

[thereof]." *Id.* Van Voorhis's statements thus explain that Congress intended the statute to exclude from the United States those subject to confinement or unable to care for themselves without significant dependence on the government, while simultaneously ensuring that arriving poor immigrants received any needed assistance.

Finally, judicial decisions from the late 1800s corroborate the aforementioned meaning of "public charge." For example, in an 1884 decision, the Supreme Court recognized that the 1882 statute — particularly the provision creating the immigrant fund — was meant to help poor immigrants upon their arrival to the United States. *See Edye v. Robertson*, 112 U.S. 580, 590-91 (1884) ("That the purpose of [the statute and those like it] is humane, is highly beneficial to the poor and helpless immigrant, and is essential to the protection of the people in whose midst they are deposited by the steam-ships, is beyond dispute.").

In short, the text, structure, legislative history, and judicial interpretations of the 1882 statute reveal that Congress — when it first used the term "public charge" — did not intend to label as a "public charge" any alien in need of some public aid. If it had, the statute would have been internally inconsistent, as numerous sources reveal that its provisions were meant to aid poor and helpless arriving immigrants — a category of persons highly likely to need some public aid. Rather, the term "public charge" was reserved for those unable to care for themselves without significant government assistance.

b.

As the years passed, Congress amended the public charge provision numerous times. For example, in 1891, Congress altered the methodology to be used in making

85

public charge determinations by adding the phrase "likely to become" before the term "public charge." In so doing, Congress empowered immigration officials to undertake a prospective examination to determine whether an arriving immigrant could become a public charge in the future. The 1891 amendments did not, however, alter the meaning of the term "public charge." *See United States v. Lipkis*, 56 F. 427, 428 (S.D.N.Y. 1893) (ruling that a woman had become a public charge because "she became insane, and was sent to the public insane asylum of the city . . . where only poor persons unable to pay for treatment are received, and she was there attended to for a considerable period at the expense of the municipality"). The court in *Lipkis* also explained that an immigrant who arrives with "little ready money" should not be declared likely to become a public charge. *Id.*

Other judicial decisions from the late 1800s likewise confirm that, as a general matter, the term "public charge" did not refer to those who merely accepted some public aid. *See Twp. of Cicero v. Falconberry*, 42 N.E. 42, 44 (Ind. App. 1895) ("The mere fact that a person may occasionally obtain assistance from the [local government] does not necessarily make such person a pauper or a public charge."); *Yeatman v. King*, 51 N.W. 721, 723 (N.D. 1892) (observing that a person can be kept "from becoming a public charge by affording [him] temporary relief").

In 1903, 1907, and 1910, Congress made additional changes to the public charge provision. As with the amendments in the late 1800s, none of the changes in the first decade of the 1900s altered the meaning of the term "public charge." The public charge provision thus continued to exclude from this country a narrow class of aliens who would

likely be unable to care for themselves without the government. Indeed, in 1916, only one percent of all arriving aliens were excluded on public charge grounds. *See* Br. of Legal Historians as Amicus Curiae 11-12.

In 1915, the Supreme Court assessed the 1910 version of the public charge provision in its decision in *Gegiow v. Uhl*, 239 U.S. 3 (1915). But *Gegiow* is not particularly helpful in the quest to discern the meaning of "public charge," as the Court evaluated only a narrow question: Whether an alien could be declared likely to become a public charge because "the labor market in the city of his immediate destination [was] overstocked." *Id.* at 9-10. And although the Court answered that question in the negative, Congress amended the public charge provision in 1917 to supersede *Gegiow*. *See* S. Rep. No. 352, at 5 (1916); *see also* An Act to Regulate the Immigration of Aliens to, and the Residence of Aliens in, the United States, ch. 29, § 3, 39 Stat. 874, 875-76 (1917).

The Supreme Court's *Gegiow* decision and the congressional amendments that followed did not, however, alter the meaning of the statutory term "public charge." Indeed, several contemporary judicial decisions confirm as much. *See Ex parte Mitchell*, 256 F. 229, 230 (N.D.N.Y. 1919); *see also Ex parte Hosaye Sakaguchi*, 277 F. 913, 916 (9th Cir. 1922) (explaining that the post-*Gegiow* congressional amendments "d[id] not change the meaning that should be given [the term 'public charge']" and that the alien before the court was not likely to become a public charge because no evidence existed showing any "mental or physical disability or any fact tending to show that the burden of supporting the [alien] is likely to be cast upon the public"). Additionally, Judge Learned Hand, writing for the Second Circuit, explained that after the 1917 amendments, the public charge provision both

overlapped "other provisions; e.g., paupers, vagrants, and the like" and covered cases "where the occasion leads to the conclusion that the alien will become destitute, though generally capable of standing on his own feet." *See United States ex rel. Iorio v. Day*, 34 F.2d 920, 922 (2d Cir. 1929). Meanwhile, the Fifth Circuit explained that even after the post-*Gegiow* amendments, the public charge provision yet applied only to those with "a condition of dependence on the public for support." *See Coykendall v. Skrmetta*, 22 F.2d 120, 121 (5th Cir. 1927).

Despite the consistency of the foregoing judicial decisions, my colleagues in the panel majority identify early decisions that they see as demonstrating the lack of an express articulation of a "primarily dependent" meaning for the term "public charge." *See ante* 40-43. Read *in toto*, however, those decisions demonstrate that the term "public charge" has always described an alien that is significantly dependent on the government. *See, e.g.*, *Skrmetta v. Coykendall*, 16 F.2d 783, 784 (N.D. Ga. 1926) ("I agree rather with the idea that Congress had in mind those who from infirmity, great age, or small age, want of property, shiftless habits, profligacy, or other things, were apparently such persons as would not maintain themselves in society by the ordinary means, and would thereby become a public charge."); *see also Dunn v. Bryan*, 299 P. 253, 257 (Utah 1931) (explaining that the term "public charge" has a "well-defined meaning," including a person whom "it may be necessary to support at public expense by reason of poverty, insanity and poverty, disease and poverty, idiocy and poverty" (internal quotation marks omitted)).

c.

Moving into the mid-20th century, the term "public charge" continued to describe those significantly dependent on the government. The several sources described below demonstrate that the term's meaning remained unchanged.

- A 1948 decision of the Board of Immigration Appeals (the "BIA") explained that an alien could not be deemed a public charge based solely on the receipt of generally available government benefits. *See Matter of B-*, 3 I. & N. Dec. 323, 324-25 (BIA 1948). In so ruling, the BIA emphasized that the "fact that the State or the municipality pays for the services accepted by the alien is not, then, by itself, the test of whether the alien has become a public charge." *Id.* at 325.[7]

- In 1952, when Congress first enacted the INA, it included a public charge provision similar to the one still in use today. A 1950 report from the Senate Judiciary Committee reveals that Congress, in passing the INA, did not desire to precisely delineate the circumstances to be considered by officials conducting a "likely to become a public charge" inquiry. *See* S. Rep. No. 81-1515, at 349 (1950) (stating that there should be "no attempt to define" the *phrase* "likely to become a public charge" in the statute because "the elements constituting likelihood of becoming a public charge are varied"). Of course, Congress's decision in that respect did not alter the baseline meaning of the term "public charge."

- In 1962, the Attorney General issued an opinion confirming that the term "public charge" continued to describe those with some level of significant dependence on the government. *See Matter of Martinez-Lopez*, 10 I. & N. Dec. 409, 421 (Op. Att'y Gen. 1964) (explaining that, in order to declare a person a public charge, "[s]ome specific circumstance, such as mental or physical disability, advanced age, or other fact reasonably *tending to show that the burden of supporting the alien is likely to be cast on the public*, must be present" and that a

---

[7] *Matter of B-* is relevant to this appeal only insofar as it illuminates the BIA's view regarding the definition of the term "public charge." That is because the BIA later clarified that the test set forth in *Matter of B-* applied to deportations on public charge grounds and not inadmissibility determinations like those covered by the DHS Rule. *See Matter of Harutunian*, 14 I. & N. Dec. 583, 585 (BIA 1974).

"healthy person in the prime of life cannot ordinarily be considered likely to become a public charge" (emphasis added)).

- In 1974, the BIA reiterated its longstanding view that a public charge is an alien with significant dependence on the government. *See, e.g.*, *Matter of Perez*, 15 I. & N. Dec. 136, 137 (BIA 1974) (ruling that the "fact that an alien has been on welfare does not, by itself, establish that he or she is likely to become a public charge"); *Matter of Harutunian*, 14 I. & N. Dec. 583, 586 (BIA 1974) (observing that in *Matter of B-*, the "words 'public charge' had their ordinary meaning, that is to say, a money charge upon or an expense to the public for support and care, *the alien being destitute*" (emphasis added)); *id.* at 589 ("Everything in the statutes, the legislative comments and the decisions points to one conclusion, that Congress intends that an applicant for a visa be excluded who is without sufficient funds to support himself, who has no one under any obligation to support him and who, being older, has an increasing chance of becoming dependent, disabled and sick."); *id.* (suggesting that although the receipt of "individualized public support to the needy" could render someone a public charge, acceptance of "essentially supplementary benefits, directed to the general welfare of the public as a whole," should not).

In short, although the public charge provision underwent several alterations in the mid-20th century, the meaning of the term "public charge" remained unchanged. Indeed, decision after decision — both from the BIA and the Attorney General — reiterated that which had been apparent since the term's initial use: An alien must be significantly dependent on the government, as opposed to a mere recipient of some public aid, to be considered a public charge.

d.

Arriving at the end of the 20th century, none of the various amendments to the INA during that period reveal a congressional desire to alter the established meaning of the term "public charge." In 1990, Congress passed a new immigration act containing a public

90

charge provision identical to the one in the 1952 INA. *See* Immigration Act of 1990, Pub. L. No. 101-649, tit. VI, § 601(a)(4), 104 Stat. 4978, 5072 (1990). Although Congress did not alter the language of the public charge provision, it did remove several of the enumerated classes of inadmissible persons, i.e., paupers, vagrants, and professional beggars. In so doing, Congress intended that the public charge provision would exclude those previously enumerated classes of inadmissible aliens. *See* 136 Cong. Rec. 36797, 36844 (Oct. 27, 1990).

Six years later, Congress passed the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, which, inter alia, amended the INA to include the Public Charge Statute at issue in these proceedings. *See* Omnibus Consolidated Appropriations Act, Pub. L. No. 104-208, tit. V, § 531, 110 Stat. 3009, 3009-674 (1996). Simultaneous with its passage of the 1996 amendments to the INA, Congress enacted the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, which limited the ability of aliens living in the United States to access certain public benefits. *See* Pub. L. No. 104-193, 110 Stat. 2105 (1996) (codified at 8 U.S.C. § 1601 *et seq.*) (the "Welfare Reform Act").

Although neither the Public Charge Statute nor the Welfare Reform Act altered the meaning of the term "public charge," Congress included a policy statement at the outset of the Welfare Reform Act explaining that "[s]elf-sufficiency has been a basic principle of United States immigration law since this country's earliest immigration statutes." *See* 8 U.S.C. § 1601(1). And Congress expressed its desire that "aliens within the Nation's borders not depend on public resources to meet their needs" and that the "availability of

91

public benefits not constitute an incentive for immigration to the United States." *Id.* § 1601(2)(A)-(B). Despite the contrary insistence of the panel majority, the Welfare Reform Act has limited relevance to the term "public charge." To be sure, the Welfare Reform Act conveys that Congress aimed to curtail the widespread use of public benefits by aliens. But the Welfare Reform Act accomplishes that goal by limiting the public benefits for which aliens are eligible, not by redefining "public charge."

Simply put, nothing in the 1990 Immigration Act, the Public Charge Statute, the other 1996 amendments to the INA, or the Welfare Reform Act changed the longstanding meaning of the term "public charge." Accordingly, "public charge," as used today in the Public Charge Statute, continues to mean an alien significantly dependent on the government.

e.

Finally, recent administrative rulemaking proceedings clearly demonstrate that the term "public charge" has always meant an alien with significant dependence on the government. For instance, in 1999, the Immigration and Naturalization Service (the "INS"), then an agency of the Department of Justice, published a proposed regulation entitled "Inadmissibility and Deportability on Public Charge Grounds." *See* 64 Fed. Reg. 28,676 (May 26, 1999) (the "1999 Proposed Rule"). Confusion following the passage of the Welfare Reform Act necessitated the 1999 Proposed Rule, as some aliens had declined to accept public benefits for fear that they would be declared public charges.

The 1999 Proposed Rule defined the term "public charge" as, inter alia, "an alien . . . who is likely to become . . . primarily dependent on the Government for subsistence,

92

as demonstrated by either the receipt of public cash assistance for income maintenance or institutionalization for long-term care at Government expense." *See* 64 Fed. Reg. at 28,677 (internal quotation marks omitted). The INS settled on the foregoing definition by relying on "the plain meaning of the word 'charge,' the historical context of public dependency when the public charge immigration provisions were first enacted more than a century ago, and . . . [the] factual situations presented in the public charge case law." *Id.* In addition to defining the term "public charge," the 1999 Proposed Rule also emphasized that the plain meaning of the term suggests "*a complete, or nearly complete, dependence on the Government* rather than the mere receipt of some lesser level of financial support." *Id.* (emphasis added).

Regarding the types of public benefits that could render an alien a public charge, the 1999 Proposed Rule explained that it has "never been [INS] policy that the receipt of any public service or benefit must be considered for public charge purposes." *See* 64 Fed. Reg. at 28,678. Indeed, the 1999 Proposed Rule explicitly stated that because "[n]on-cash benefits, such as [supplemental nutrition assistance programs], are by their nature supplemental and frequently support the general welfare," acceptance thereof should not be considered in public charge analyses. *Id.* Consequently, the 1999 Proposed Rule related that only the acceptance of "public cash assistance" or "institutionaliz[ation] for long-term care" should be factored into the public charge analysis. *Id.* Finally, the 1999 Proposed Rule adopted longstanding principles derived from the public charge precedents, such as the requirement that immigration officials employ a "totality of the circumstances" approach in "making a prospective public charge decision." *Id.* at 28,679.

93

Although the 1999 Proposed Rule provided new details regarding public charge determinations, nothing therein purported to change the established meaning of the term "public charge." On the contrary, the 1999 Proposed Rule actually sought to codify the definition derived from the term's historical usage. *See* 64 Fed. Reg. at 28,677. Ultimately, however, the 1999 Proposed Rule was not finalized.

Notwithstanding the failure to finalize the 1999 Proposed Rule, its definition of "public charge" was nevertheless implemented by the INS via a document entitled "Field Guidance on Deportability and Inadmissibility on Public Charge Grounds." *See* 64 Fed. Reg. 28,689 (Mar. 26, 1999) (the "1999 Field Guidance"). The INS issued the 1999 Field Guidance two months before the 1999 Proposed Rule as a stopgap measure to clarify confusion surrounding the interplay between the Public Charge Statute and the Welfare Reform Act pending finalization of the 1999 Proposed Rule. To that end, the 1999 Field Guidance immediately adopted the definition of the term "public charge" contained in the 1999 Proposed Rule and barred immigration officials making public charge determinations from placing "any weight on the receipt of non-cash public benefits (other than institutionalization) or the receipt of cash benefits for purposes other than for income maintenance." *Id.* at 28,689. Importantly, like the 1999 Proposed Rule, the 1999 Field Guidance explicitly contemplated that its definition of "public charge" would not significantly alter public charge determinations. *Id.* at 28,692 (explaining that the 1999 Field Guidance's definition should not "substantially change the number of aliens who will be found . . . inadmissible as public charges"). After its adoption, the 1999 Field Guidance controlled public charge determinations until the promulgation of the DHS Rule in 2018.

* * *

In sum, this review of the history of the term "public charge" reveals a simple truth that the panel majority and DHS fail to acknowledge:  since its first use in 1882, the term has consistently described aliens who are significantly dependent on the government.  The text, structure, legislative history, and judicial interpretations of the various public charge provisions permit no other conclusion.  It is against this consistent history that the DHS Rule must be evaluated.

2.

Turning now to the DHS Rule, DHS promulgated it on August 14, 2019, pursuant to its rulemaking authority under the INA and the APA.  *See* 84 Fed. Reg. 41,501 (Aug. 14, 2019).  Put simply, the Rule extraordinarily expands the definition of "public charge," resulting in a definition of staggering breadth.

The DHS Rule's expansive sweep can be gleaned from its definitions alone.  To that end, the Rule says that a "public charge" is "an alien who receives one or more public benefits . . . for more than 12 months in the aggregate within any 36-month period (such that, for instance, receipt of two benefits in one month counts as two months)."  *See* 84 Fed. Reg. at 41,501.  And the term "public benefit," as used in the Rule, includes: (1) "[a]ny Federal, State, local, or tribal cash assistance for income maintenance (other than tax credits)"; (2) "Supplemental Nutrition Assistance Program (SNAP)"; (3) "Section 8 Housing Assistance"; (4) "Section 8 Project-Based Rental Assistance"; (5) certain Medicaid services; and (6) "Public Housing under section 9 of the U.S. Housing Act of 1937."  *Id.*  Moreover, the Rule provides specific guidance regarding how immigration

95

officials should conduct public charge assessments. To be sure, the Rule purportedly retains the totality-of-the-circumstances evaluation that has long applied to public charge determinations, but that evaluation is now singularly focused on whether an alien is "more likely than not at any time in the future to receive one or more public benefits . . . for more than 12 months in the aggregate within any 36-month period." *Id.* at 41,502.[8] Owing to the confluence of the Rule's various provisions, an alien can now be deemed a public charge predicated on the potential acceptance of a small amount of government benefits for a short period of time.

3.

Having catalogued the history of the term "public charge" and the specifics of the DHS Rule, the question now is whether the Rule's definition of "public charge" contravenes the Public Charge Statute. Although I bypass *Chevron*'s first step predicated on the assumption that some ambiguity inheres in the meaning of "public charge," as used in the Public Charge Statute, it is clear that the Rule's definition of "public charge" is unreasonable and thus fails at *Chevron*'s second step.

---

[8] The DHS Rule instructs immigration officials, in assessing the totality of the circumstances, to consider a panoply of factors. Some of those factors are of questionable relevance. For example, the Rule instructs officials to consider "[w]hether the alien is proficient in English or proficient in other languages in addition to English." *See* 84 Fed. Reg. at 41,504. English proficiency had never been considered as part of the public charge inquiry, and the Rule does not indicate why English proficiency is now relevant. *See* Br. of U.S. House of Representatives as Amicus Curiae 20-21.

a.

As explained, the question at step two of the *Chevron* inquiry is whether the DHS Rule's definition of "public charge" is reasonable. *See Nat'l Elec. Mfrs. Ass'n v. U.S. Dep't of Energy*, 654 F.3d 496, 505 (4th Cir. 2011). That is because a court is obliged, at *Chevron*'s second step, to "afford 'controlling weight' to [a] . . . reasonable interpretation even where [the court] would have, if writing on a clean slate, adopted a different interpretation." *Id.* (quoting *Regions Hosp. v. Shalala*, 522 U.S. 448, 457 (1998)); *see also Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 986 (2005).

Importantly, however, the deference afforded to an agency's reasonable interpretation of a statute at *Chevron*'s second step is not an open invitation to the agency to conjure up any interpretation. Indeed, even statutory terms lacking an unambiguous meaning at *Chevron*'s first step can have definitional limits beyond which the agency may not venture for purposes of *Chevron*'s second step. *See Cuomo v. Clearing House Ass'n*, 557 U.S. 519, 525 (2009) (explaining that "the presence of some uncertainty does not expand *Chevron* deference to cover virtually any interpretation of" the statute at issue). The Supreme Court explained that principle in its *Cuomo* decision, clarifying that when there is "necessarily some ambiguity as to the meaning of [a] statutory term," an executive branch agency "can give authoritative meaning to the statute *within the bounds of that uncertainty.*" *Id.* (emphasis added). And to discern the scope of the ambiguity beyond which the agency may not venture, a court is obliged to consider, inter alia, "[e]vidence from the time of the statute's enactment," "[court] cases," and "normal principles of construction." *Id.* Put another way, "even through the clouded lens of history," typical

97

tools of statutory construction allow courts to "discern the outer limits of [a statutory] term." *Id.*[9]

b.

Bearing in mind the principles espoused in *Cuomo*, the statutory context and history of the term "public charge" reveal that the term has an outer limit beyond which DHS may not traverse. As Chief Judge Wood of the Seventh Circuit recently put it: "There is a floor inherent in the words 'public charge,' backed up by the weight of history." *See Cook Cty.*, 962 F.3d at 229. That floor requires a public charge finding to be predicated on some sort of significant dependence upon public benefits — even if the level of dependence falls somewhere below "primary dependence." To say otherwise simply ignores the statutory context and extensive history of the term "public charge."

But the panel majority, apparently content to brush aside statutory structure and history, opts to use the most broad and generic definition of the word "charge." In my

---

[9] The panel majority maintains that the Public Charge Statute's use of the phrase "in the opinion of" confers some extraordinary discretion upon DHS regarding its ability to define the term "public charge." *See* 8 U.S.C. § 1182(a)(4)(A) ("Any alien who . . . *in the opinion of* the Attorney General at the time of application for admission or adjustment of status, is likely at any time to become a public charge is inadmissible." (emphasis added)); *see also ante* 31. The location of the "in the opinion of" phrase demonstrates, however, that it affords discretion in determining — based on the totality of the circumstances — whether a given alien is "likely at any time to become a public charge." *See Matter of Harutunian*, 14 I. & N. Dec. at 588 (observing that "Congress inserted the words 'in the opinion of' . . . with the manifest intention of putting borderline adverse determinations beyond the reach of judicial review"); *see also* S. Rep. No. 81-1515, at 349 (explaining that because there is "no definition of the term 'likely to become a public charge' in the statutes, its meaning has been left to the interpretation of the administrative officials and the courts"). The phrase clearly does not expand DHS's authority to define the term "public charge."

98

colleagues' view, any alien who is likely to produce any "money charges upon the public for support and care" can be a public charge. *See ante* 34. The majority sees the word "charge" in the Public Charge Statute as akin to the type of charge people routinely encounter — a charge for a meal at a restaurant or for an airline ticket. The statutory context and the weight of history, however, plainly counsel that this cannot be the proper definition. Rather, the word "charge," as used in the Public Charge Statute, defines a person dependent on someone or something else — that is, a person who is the charge of another.

Several indicators confirm that this latter meaning is the proper one. For one thing, since its earliest appearance in the immigration statutes, the term "public charge" has always accompanied other terms defining classes of persons — such as, "idiots, insane persons, [and] paupers." *See* An Act in Amendment to the Various Acts Relative to Immigration, Ch. 551, § 1, 26 Stat. 1084, 1084 (1891). That circumstance strongly suggests that the word "charge," as used in the Public Charge Statute, should not be given its broadest possible meaning, but rather should be read as describing a type of person — one who is the charge of another. *See S.D. Warren Co. v. Maine Bd. of Envtl. Prot.*, 547 U.S. 370, 378 (2006) (explaining that, in statutory interpretation, "a word is known by the company it keeps" (internal quotation marks omitted)).

Additionally, as mentioned, the majority's construction of the Public Charge Statute renders any alien who imposes a charge upon the public a "public charge." But the Public Charge Statute does not sweep so broadly. It does not exclude from the country any alien likely to accept a public benefit and thereby impose a charge on the public; rather, it

99

excludes aliens who are likely to become "a public charge." If Congress wanted to exclude the former category, it could have done so. Indeed, other INA provisions — for example, the affidavit-of-support provision — reveal that Congress knows how to assign immigration consequences to those who accept *any public benefit*. *See* 8 U.S.C. § 1183a(b)(1)(A) (stating that sponsored alien must repay government for acceptance of "any means-tested public benefit" and specifying consequences for failure to repay). But Congress did not exclude via the Public Charge Statute aliens who receive any public benefit; it excluded those likely to become "a public charge." And that choice carries meaning. *Cf. Jama v. Immigration & Customs Enf't*, 543 U.S. 335, 341 (2005) (explaining that courts do not "lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply" and that the "reluctance is even greater when Congress has shown elsewhere in the same statute that it knows how to make such a requirement manifest").

At bottom, the statutory structure, when paired with the history of the term "public charge," confirms that the term does not extend to cover any alien who may impose a money charge upon the government, but rather reaches only those who are significantly dependent on the government in some manner. Accordingly, the majority's contention that DHS will struggle to discern the floor inherent in the term is wholly unfounded. As heretofore explained, the floor is a conspicuous one that DHS simply chose to flout.[10]

---

[10] My colleagues criticize this dissent for concluding that the term "public charge" has a definitional outer limit, but even they tacitly acknowledge that "public charge" has a

c.

Having identified the outer limits of the term "public charge" — that is, a significant level of dependence on the government — the remaining question is whether the DHS Rule's definition of the term falls within those outer limits. And it plainly does not. Accordingly, the Rule's boundless definition of "public charge" is unreasonable and fails at *Chevron*'s second step.

Initially, a cursory examination of the DHS Rule's definition of "public charge" makes clear that the Rule has ventured beyond the outer limits of the statutory meaning of the term. Historically, an alien could be deemed a public charge only if that person was, in some way, significantly dependent on the government. No longer. Under the Rule, any alien who receives 12 months' worth of benefits in a 36-month period is a public charge. And those benefits stack, meaning that the acceptance of multiple discrete benefits in a single month equals multiple months' worth of benefits. The Rule does not stop there, as it mandates that immigration officials consider the acceptance of supplemental public benefits that never before played a role in public charge determinations — like SNAP assistance, Section 8 Housing assistance, and Medicaid services. Additionally, the Rule goes even a step further by placing no minimum requirement on the amount of benefits accepted. The various features of the Rule thus work in concert to render any alien who receives a de minimis amount of public benefits for a de minimis period of time a "public

---

definitional floor. *See ante* 52-53 (reserving for another day question of precise floor of term).

101

charge." *See Cook Cty.*, 962 F.3d at 229. But an alien who receives such a miniscule amount of benefits cannot reasonably be declared significantly dependent on the government. *Id.* at 232 (explaining that the benefits covered in the Rule "are largely *supplemental* and not intended to be, or relied upon as, a primary resource for recipients" and that "[m]any recipients could get by without them, though as a result they would face greater health, nutrition, and housing insecurity").[11]

Additionally, the consequences of the DHS Rule's redefinition of "public charge" underscore its unreasonableness. *See Cuomo*, 557 U.S. at 529 ("The consequences of the regulation also cast doubt upon its validity."). To capture the scope of the change caused by the Rule, consider the following real-world example regarding SNAP benefits. In order to qualify for the SNAP program, an individual must make less than $16,248 per year.[12] Individuals who qualified for the program in 2019 — approximately 35.7 million people per month — received an average monthly benefit of $129.83.[13] Accordingly, under the

---

[11] The majority insists that it is fanciful to conclude that an alien who is likely to receive a small amount of supplemental public benefits for a short period of time will be declared likely to become a public charge under the DHS Rule. *See ante* 52-53. But that conclusion flows directly from the plain text of the Rule. *See* 84 Fed. Reg. at 41,501. In reality, it is my friends who have resorted to speculation in predicting that DHS will not — for reasons left unexplained — apply the Rule according to its plain text.

[12] For additional context, according to calculations from the Center for Poverty Research at the University of California, Davis, an individual in the United States working full-time for minimum wage earns $15,080 per year. *See* https://poverty.ucdavis.edu/faq/what-are-annual-earnings-full-time-minimum-wage-worker (last visited June 30, 2020).

[13] The data regarding SNAP benefit usage was obtained from the website of the Food and Nutrition Service, an agency of the Department of Agriculture. The full data set can be found at: https://fns-prod.azureedge.net/sites/default/files/resource-files/SNAPsummary-6.pdf (last visited June 30, 2020).

Rule, any alien applying for admission or adjustment of status who is more likely than not, at any point in his lifetime, to receive a monthly benefit of $129.83 for 12 out of 36 months is excludable from the country on public charge grounds. And if that alien happens to also receive housing and Medicaid assistance, in any amount, it would only take that person a mere four months to become a public charge. Such a person, however, cannot reasonably be declared significantly dependent on the government.

The DHS Rule's unreasonableness is further compounded by the fact that the Rule's definition of "public charge" is cut from whole cloth. DHS and the panel majority assure us, however, that the Rule's definition is actually based on data demonstrating that "a substantial portion of individuals who receive public benefits do so for fewer than 12-months and that those who receive such benefits over a longer period are more likely to become 'long-term recipients' of welfare." *See ante* 15-16 (citation omitted); *see also* 84 Fed. Reg. 41,292, 41,359-41,362 (Aug. 14, 2019). But the Rule does not define a public charge as an individual who receives public benefits for 12 months or more; the Rule defines a public charge as any alien who receives 12 months' worth of public benefits — *in the aggregate* — in a 36-month period. Accordingly, under the Rule's definition, an alien who receives a miniscule amount of three supplementary public benefits for four months is a public charge. So, data indicating that the likelihood of long-term benefit usage increases for those persons who receive public benefits for 12 months or more are quite beside the point. If anything, the mismatch between the data DHS relied on to craft the Rule and the provisions of the Rule itself only underscore the unreasonableness of the Rule's "public charge" definition. *See Cook Cty.*, 962 F.3d at 229-33 (declaring Rule likely

arbitrary and capricious because of serious mismatch between Rule and both data DHS relied upon in crafting Rule and text of Public Charge Statute); *see also Judulang v. Holder*, 565 U.S. 42, 52 n.7 (2011) (explaining overlap between arbitrary and capricious evaluation and inquiry at *Chevron*'s second step).

The majority also seeks to justify the DHS Rule by way of the Welfare Reform Act, which restricts the public benefits that aliens may receive. In the majority's view, the Rule's definition of "public charge" must be reasonable because it harmonizes with the policy statement at the outset of the Welfare Reform Act, which expresses Congress's desire that aliens be self-sufficient. My good friends are mistaken. To begin, a policy statement is always of limited persuasiveness. *Cf. Comcast Corp. v. F.C.C.*, 600 F.3d 642, 654 (D.C. Cir. 2010) ("Policy statements are just that — statements of policy."). And that persuasive power further fizzles when considering that this policy statement accompanies the Welfare Reform Act, which is not at issue in these proceedings and says nothing about the Public Charge Statute or the term "public charge." *See Cook Cty.*, 962 F.3d at 228. Additionally, to the extent that Congress expressed its concern about the self-sufficiency of aliens in the Welfare Reform Act, it addressed that concern therein by restricting the benefits for which aliens are eligible. *Id.* Accordingly, relying on the Welfare Reform

104

Act's policy statement to justify a boundless construction of the term "public charge," or to countenance the Rule's cavernous definition thereof, is inappropriate.[14]

Finally, the unreasonableness of the DHS Rule is plainly apparent when considering the overall statutory context, as the Rule "creates serious tensions, if not outright inconsistencies, within the statutory scheme." *See Cook Cty.*, 962 F.3d at 228. Specifically, the Rule allows DHS to consider an alien's acceptance of benefits that he is eligible to receive under both the Welfare Reform Act, *see* 8 U.S.C. §§ 1611, 1621, and the Farm Security and Rural Investment Act of 2002, *see* Pub. L. No. 107-171, 116 Stat. 134 (2002). Accordingly, under the Rule, an alien can be deemed likely to become a public

---

[14] In its recent *Cook County* decision, the Seventh Circuit explained the proper interplay between the Welfare Reform Act, the Public Charge Statute, and the DHS Rule. As Chief Judge Wood related:

> The INA does not call for total self-sufficiency at every moment; it uses the words "public charge." DHS sees "lack of complete self-sufficiency" and "public charge" as synonyms: in its view, receipt of any public benefit, particularly one related to core needs such as health care, housing, and nutrition, shows that a person is not self-sufficient. This is an absolutist sense of self-sufficiency that no person in a modern society could satisfy; everyone relies on nonmonetary governmental programs, such as food safety, police protection, and emergency services. DHS does not offer any justification for its extreme view, which has no basis in the text or history of the INA. As we explained earlier, since the first federal immigration law in 1882, Congress has assumed that immigrants (like others) might face economic insecurity at some point. Instead of penalizing immigrants by denying them entry or the right to adjust status, Congress built into the law accommodations for that reality.

*See Cook Cty.*, 962 F.3d at 232 (citation omitted).

charge because that alien might accept public benefits that Congress explicitly authorized him to receive. To put it mildly, that result verges on the absurd. *See Cook Cty.*, 962 F.3d at 228 (explaining that the Rule sets a "trap for the unwary by penalizing people for accepting benefits Congress made available to them" (internal quotation marks omitted)). And it provides strong evidence that the Rule's definition of "public charge" is unreasonable. *Cf. Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982) (explaining that "interpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available").[15]

At bottom, the Public Charge Statute does not exclude from the country any alien who is likely to need public assistance during his time in the country, it excludes those "likely at any time to become a public charge." *See* 8 U.S.C. § 1182(a)(4)(A). And the history of the term "public charge" reveals that the term means an alien who is somehow

---

[15] The majority attempts to minimize the tension between the DHS Rule and the federal immigration laws by accusing this dissent of "pick[ing] and scratch[ing] at the Rule" to unearth tangential inconsistencies. *See ante* 50. But discerning that the Rule is in outright conflict with both the Public Charge Statute and the Welfare Reform Act does not require any mental gymnastics. Indeed, a careful, straightforward examination of the statutory context and history of the term "public charge" — an examination free from the taint of any grand pronouncements about a preferred policy outcome — lays bare the irreconcilable conflict between the Rule and our immigration statutes. And that conflict dooms the Rule. *See Dixon v. United States*, 381 U.S. 68, 74 (1965) ("The power of an administrative officer or board to administer a federal statute and to prescribe rules and regulations to that end is not the power to make law . . . but the power to adopt regulations to carry into effect the will of Congress as expressed by the statute. A regulation which does not do this, but operates to create a rule out of harmony with the statute, is a mere nullity." (internal quotations marks omitted)).

significantly dependent on the government. *See Cook Cty.*, 962 F.3d at 229. If Congress wanted to expand the exclusion by declaring inadmissible not just those likely to be significantly dependent on the government, but also those who might receive any quantum of public assistance, it could have done so. But DHS cannot unreasonably interpret a statutory term so that it may do by executive fiat what Congress has declined to do. The DHS Rule is a textbook example of executive branch overreach that is forbidden in our constitutional system. *Cf. ante* 70 ("It is beyond the power of any one person to set himself up as the arbiter of law in these entire United States.").

In the face of the extensive history accompanying the term "public charge," to conclude that the DHS Rule's definition of "public charge" is reasonable makes a mockery of the term "public charge," "does violence to the English language and the statutory context," and disrespects the choice — made consistently by Congress over the last century and a quarter — to retain the term in our immigration laws. *See Cook Cty.*, 962 F.3d at 229. For those reasons, the Rule's "public charge" definition ventures far beyond any ambiguity inherent in the meaning of the term "public charge," as used in the Public Charge Statute, and thus fails at *Chevron*'s second step. In light of the foregoing, the plaintiffs are likely to succeed on the merits of their claim that the Rule is unlawful, and the majority is wrong to conclude otherwise.[16]

---

[16] During the pendency of this appeal, the Supreme Court — on emergency request of the government — stayed injunctions entered by district courts in the Northern District of Illinois and the Southern District of New York that prohibited implementation of the DHS Rule. *See Wolf v. Cook Cty., Ill.*, 140 S. Ct. 681 (Feb. 21, 2020); *Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599 (Jan. 27, 2020). Although my colleagues in the majority

C.

1.

Having concluded that the plaintiffs are likely to succeed on the merits of their claim against the DHS Rule, the next assessment is whether the other preliminary injunction factors weigh in favor of preliminarily enjoining implementation of the Rule. Those factors are whether (1) CASA is "likely to suffer irreparable harm in the absence of preliminary relief"; (2) "the balance of equities tips in [CASA's] favor"; and (3) "an injunction is in the

---

believe that the Court's stay orders put a thumb on the scale in favor of DHS, *see ante* 5-7, I do not agree. In my view, assigning such significance to perfunctory stay orders is problematic. *See Wolf*, 140 S. Ct. at 683-84 (Sotomayor, J., dissenting) (observing that decisions rendered pursuant to emergency stay requests force the Court "to consider important statutory and constitutional questions that have not been ventilated fully in the lower courts, on abbreviated timetables and without oral argument"). That is particularly so because, as Justice Sotomayor recently explained, such stays — which were once reserved for the rarest of cases — have become commonplace. *Id.* at 683 (explaining that the government, "[c]laiming one emergency after another," has "come to treat the exceptional mechanism of stay relief as a new normal" and has "recently sought stays in an unprecedented number of cases" (internal quotation marks and alteration omitted)). If the Court's decision to grant a stay could be understood to effectively hand victory to the government regarding the propriety of a preliminary injunction, there would be little need for an intermediate appellate court to even consider the merits of an appeal in which the Court has granted a stay. *See Cook Cty.*, 962 F.3d at 234 ("The stay . . . preserves the status quo while . . . case[s] . . . percolate up from courts around the country. There would be no point in the merits stage if an issuance of a stay must be understood as a *sub silentio* disposition of the underlying dispute."). Indeed, even the Court's orders staying the aforementioned preliminary injunctions contemplate full hearings on the merits by the courts of appeals. *See Wolf*, 140 S. Ct. at 681; *New York*, 140 S. Ct. at 599. Accordingly, the Court's stay orders do not control our evaluation of the merits of the preliminary injunction at issue in these proceedings.

public interest." *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).[17]

Despite the panel majority's rulings to the contrary, each of those factors weighs in favor of preliminarily enjoining implementation of the Rule.

a.

Beginning with whether CASA will face irreparable harm in the absence of a preliminary injunction, we are obliged to consider whether "irreparable injury is *likely* in the absence of an injunction." *See Winter*, 555 U.S. at 22; *see also Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017) (explaining that "more than just a 'possibility' of irreparable harm" is necessary).  To carry its burden, CASA must make a "clear showing that it will suffer harm that is neither remote nor speculative, but actual and imminent." *See Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*, 915 F.3d 197, 216 (4th Cir. 2019) (internal quotation marks omitted). Additionally, the harm must be truly irreparable, meaning that it must be incapable of being "fully rectified by the final judgment after trial." *Id.* (internal quotation marks omitted).

In my view, the district court did not abuse its discretion in determining that CASA is likely to suffer irreparable harm if the DHS Rule is not enjoined.  CASA claims that, because of the Rule, it must divert resources away from its core legislative advocacy mission and toward efforts to counsel its members about the effects of the Rule.  And according to CASA, those advocacy efforts cannot be adequately undertaken at a different

---

[17] In assessing the remaining preliminary injunction factors, my focus, like that of the panel majority and the district court, is on CASA (as opposed to the individual plaintiffs).

time because they are dependent on political will and the legislative cycle. Such allegations demonstrate irreparable harm. *See Mountain Valley Pipeline, LLC*, 915 F.3d at 217; *Mountain Valley Pipeline, LLC v. W. Pocahontas Props. Ltd. P'ship*, 918 F.3d 353, 366 (4th Cir. 2019); *see also League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016) (explaining that because decisions of the defendant "unquestionably ma[d]e it more difficult for the [plaintiff organization] to accomplish [its] primary mission," the organization suffered injury sufficient for purposes of both "standing and irreparable harm").

b.

The remaining pieces of the preliminary injunction puzzle to consider are whether the balance of equities and the public interest weigh in favor of granting relief. Because the government is a party in these proceedings, those two factors can be considered together. *See Pursuing America's Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016); *see also Nken v. Holder*, 556 U.S. 418, 435 (2009).

In the panel majority's view, DHS's interest in "not burdening the public fisc by admitting public charges" is more important than the harm CASA will face from the impairment of its organizational mission and the diversion of its resources. *See ante* 55-56. I disagree. Absent a preliminary injunction, CASA's organizational mission will undoubtedly continue to be frustrated and its resources diverted. Moreover, the public interest will be harmed if aliens living in the United States disenroll from public benefits for which they are eligible due to fear of immigration consequences stemming from the

DHS Rule. On the other hand, DHS's purported interests — when weighed against the significant harms CASA faces — fail to measure up.

At the end of the day, DHS contends that it has an overriding interest in immediately implementing its preferred policy and that such an interest tips the balance of equities and the public interest in its favor. Although the majority dutifully accepts that contention, I do not. If immediate implementation of a preferred policy were sufficient to tilt the balance of equities and public interest in favor of DHS, every plaintiff seeking a preliminary injunction against governmental action would be on a fool's errand. Accordingly, the harm CASA will suffer absent a preliminary injunction far outweighs any interest DHS may have in immediately implementing its preferred policy. The majority errs in concluding otherwise.

2.

Finally, the panel majority launches a broadside against the propriety of nationwide preliminary injunctions. In the context of its other rulings, however, the majority's attack is dicta. And in any event, my friends are wrong in their criticism of the scope of the district court's injunction. To be sure, a nationwide preliminary injunction is a strong remedy. But district courts are entitled to wide discretion in fashioning injunctive relief. *See South Carolina v. United States*, 907 F.3d 742, 753 (4th Cir. 2018). And here, the district court's decision to preliminarily enjoin implementation of the DHS Rule nationwide is a perfectly appropriate exercise of that considerable discretion. *See Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) ("[T]he scope of injunctive relief is dictated by the extent of the violation established, not by the geographical extent of the plaintiff class.");

*see also Texas v. United States*, 809 F.3d 134, 187-88 (5th Cir. 2015) (affirming nationwide injunction barring implementation of immigration policy and emphasizing that immigration policy should be uniform throughout the country).

\* \* \*

In sum, the Public Charge Statute excludes aliens from this country and prohibits aliens already living in the country from adjusting their immigration statuses if they are likely to become public charges. Although the Public Charge Statute does not define the term "public charge," the usual tools of statutory construction reveal that "public charge" has always described an alien likely to be significantly dependent on the government. The DHS Rule, however, alters that definition, declaring that any alien likely to receive a de minimis amount of supplemental public benefits for a de minimis period of time is excludable as a public charge. Under any reasonable construction, a person receiving such a miniscule amount of benefits cannot be said to be significantly dependent on the government. Because the Rule fixes a boundless definition of "public charge," it lands far afield of any reasonable interpretation of the Public Charge Statute. Accordingly, the plaintiffs are likely to succeed on the merits of their challenge to the lawfulness of the Rule. And because the remaining preliminary injunction factors weigh in favor of granting relief, the district court did not abuse its discretion in preliminarily enjoining implementation of the Rule, even on a nationwide basis.

III.

Pursuant to the foregoing, I would affirm the preliminary injunction entered by the district court. I therefore respectfully dissent.